[No. F048123. Fifth Dist. Nov. 7, 2006.]

FRANCIS ROBERTSON et al., Plaintiffs and Respondents, v.
FLEETWOOD TRAVEL TRAILERS OF CALIFORNIA, INC., Defendant
and Appellant.

## COUNSEL

Borton Petrini & Conron, Dale Dorfmeier and Robert A. Parkinson for Defendant and Appellant.

Rosner, Law & Mansfield and Douglas D. Law for Plaintiffs and Respondents.

## OPINION

KANE, J.—Plaintiffs Lorna and Francis Robertson sued defendant Fleetwood Travel Trailers of California, Inc. (Fleetwood), under the Song-Beverly Consumer Warranty Act (the Song-Beverly Act) (Civ. Code, § 1790 et seq.),[1] based on a persistent water leak in their new Fleetwood travel trailer that was not repaired within a reasonable number of attempts. After extensive water accumulation was discovered in the underbelly of the trailer, the Robertsons concluded enough was enough and demanded that Fleetwood repurchase the trailer. Fleetwood did not do so, insisting it should be given an opportunity to repair the water damage. A jury found that Fleetwood violated the refund-or-replace provisions of the Song-Beverly Act and awarded the Robertsons damages of $22,000, plus a civil penalty of $16,000 for Fleetwood's "willful" failure to comply with its statutory obligations. The trial court awarded attorney fees in the sum of $231,187.45. Defendant Fleetwood appeals, primarily contending it had no obligation to repurchase or replace the trailer under the Song-Beverly Act because it was never given a reasonable opportunity to repair the water damage, which it views as a separate matter from the water leak. We will reverse and remand with instructions to redetermine attorney fees. In all other respects the judgment will be affirmed.

### FACTS AND PROCEDURAL SUMMARY

On July 8, 2002, plaintiffs Lorna and Francis Robertson purchased a new 39-foot Wilderness travel trailer manufactured by Fleetwood. It was fully

[1] All further statutory references are to the Civil Code unless otherwise specified.

warranted by Fleetwood under a comprehensive two-year warranty. The owner's manual summarized the "full two year warranty" as follows: "Your new trailer, including the structure, plumbing, heating, electrical systems, and all appliances and equipment installed by the manufacturer, is warranted under normal use to be free from manufacturing defects in material or workmanship."

The Robertsons bought their travel trailer from Visalia RV Sales & Service (Visalia RV), an authorized dealership and repair facility for Fleetwood trailers and recreational vehicles. At the time of purchase, the Robertsons explained to Visalia RV that Mr. Robertson intended to live in the trailer at the Wooden Shoe Trailer Park, only a few blocks away from the dealership, but they did not have a tow vehicle. As a courtesy, Visalia RV delivered the trailer to the Robertsons at the Wooden Shoe Trailer Park. Later, when the Robertsons began to complain of the water leak problem, Visalia RV willingly sent a repairman out to the trailer park to conduct the repairs from there.

The trailer was used for Mr. Robertson to live in during his employment in the Visalia area. Lorna visited her husband at the trailer about once a month, and it was during her periodic visits that she made her calls or complaints about the water leak, as described hereafter.

Not long after their purchase the Robertsons began noticing a water leak or water build up on the floor around the shower area of the trailer. Although the amount of water would vary, and sometimes two or three days would go by without seeing the puddles, the location and manner that the water formed would always be the same. In August of 2002, Lorna Robertson first telephoned Visalia RV to report the shower leak. Rather than requiring the Robertsons to bring their trailer back to the dealership for repairs, Allen Wood, the owner of Visalia RV, authorized its repairman Chuck Smith to perform the repairs at the Wooden Shoe Trailer Park. Mr. Smith arrived on August 8, 2002, and attempted repair of the leak by adjusting the shower door and applying sealant on the base of the shower. His testimony was that he saw the shower door was not aligned right—it left a gap—and he believed that in correcting the alignment the leak had been fixed.[2] However, according to Lorna Robertson, who said she watched the entire repair, Mr. Smith never ran the water either prior to or after the attempted repair, and he never removed the paneling or "fascia" at the bottom of the shower to view the P-trap[3] and drainage underneath in order to inspect for leaks. After the repair, the shower continued to leak in the same manner as before.

---

[2] On cross-examination, the jury also heard for purposes of impeachment Mr. Smith's prior testimony in which he said he could not recall seeing a leak from the shower door.

[3] A "P-trap" is defined as "a P-shaped trap used especially for sinks and lavatories." (Webster's 3d New Internat. Dict. (1986) p. 1835.) Here, it was located just below the shower drain.

Lorna Robertson called back to complain about the same leak in September of 2002, but at that time Visalia RV could not send someone out on short notice and she needed to get back to Utah (their permanent residence), so the dealer indicated someone would come out and use the "pass key" to get into the trailer to perform repairs. She telephoned again in October of 2002 to report the same leak, but at that time the dealer was apparently unable to send a repairman. In January of 2003, she first noticed mold on the bedroom wall that abuts the trailer bathroom. She had no idea of its possible cause and did not give it much thought at the time. She simply cleaned the mold off with bleach and water.

In January of 2003, Lorna Robertson called Visalia RV to complain further about the continuing water leak near the shower and also to report *something else*—water was dripping from two spots in the front underneath area of the trailer. Visalia RV sent Mr. Smith out on January 24, 2003. Mrs. Robertson told him the shower continued to leak and also showed him the location of the two drips at the front of the trailer and the wet area where the water had saturated the dirt underneath the trailer. It had been raining, so Mr. Smith surmised it might be from the rain or from air conditioning condensation. Lorna Robertson replied that the drips were there before the rain, and that they had not used the air conditioning. Mr. Smith performed no repairs that day, but said he would come back another time (when it was not raining) to examine the water drips underneath the trailer and to repair the shower leak.

In February or March of 2003, Lorna Robertson noticed more mold in the trailer under the bathroom sink, on the floor of the kitchen cabinet and more in the back bedroom. These were the areas where the water leak reportedly ran.

Following another phone call from Mrs. Robertson to Visalia RV to complain about the continuing water leak near the shower, Mr. Smith returned to the trailer on March 10, 2003. Both Lorna and Francis Robertson were present. During this repair attempt, Mr. Smith resealed the shower once again. He testified that he found a small hole in the sealant and observed water leaking out of it, and so he resealed the area where the hole was found.[4] He admits he did not perform a leak test after this repair, which failure was purportedly because he needed to let the sealant dry. In contradiction of Smith's testimony, Lorna Robertson, who was present with Mr. Smith during the repairs, never saw him run the shower at all. Nor did he give any indication that he had found a leak, but he merely told her he was putting sealant along the glass bottom wall of the shower "to see if that was where it

---

[4] On cross-examination, Mr. Smith's recollection at trial was shown to conflict with his prior deposition testimony on whether he actually found a problem or gap in the sealant, or whether he merely resealed it as a matter of course.

was coming from." She also indicates it was during the March 10, 2003 visit that she had a discussion with Mr. Smith concerning the mysterious way the water would form or appear: "[I]t would just kind of form right onto the floor right at the very bottom of this shower. There was never any trails. There was never anything else. We could not figure out where this water was coming from." Upon hearing this information he seemed as "baffled . . . as we were" with the leaking problem, but "he did try sealing every single place inside that shower over and over again."

During the March 10, 2003 repair visit, Mr. Smith also inspected the front, underneath area of the trailer where Mrs. Robertson reported dripping, and indicated it was something to keep an eye on, but no repair or further investigation was attempted by him.[5] According to Mrs. Robertson, Smith said he would wait until he had a mat or creeper to slide under the trailer before he investigated further. The repair order written by Mr. Smith regarding the March 10, 2003 repairs stated candidly that the leaks under the trailer "could be due to the shower leak." His testimony acknowledged the statement in the repair order, and explained further that "if water leaks onto the floor, it's going to come out any possible outlet it can find down through the subfloor." Once again, after this repair visit, the shower continued to leak in the same manner as before.

In regard to the repair attempts noted above, it is significant that Robert Olson, Fleetwood's Technical Service Representative and technical expert at trial, testified that if a customer complained about leaks underneath a trailer, a trained technician would be expected to perform a pressure test and check the P-trap for leaking. Mr. Smith also testified that a water test was normal procedure for a shower leak.

In the ensuing months, Lorna Robertson made additional telephone calls to Visalia RV to report that the shower leak and the drips in front of the trailer were continuing. Then, in October of 2003, while she was cleaning hair out of the shower drain with tweezers, she noticed the drain pipe was moving and had apparently broken off. She contacted Visalia RV and Mr. Smith came out right away. When he removed the panel or fascia at the base of the shower, she could see the broken P-trap, which was completely severed from the shower drain due to a jagged crack. She noticed that the location on the P-trap or nut where the crack occurred was *above* the level of the trailer

---

[5] Mrs. Robertson stated she showed him the drips; while Mr. Smith said he saw stains on the trailer where dripping had occurred, he did not see any actual water dripping.

floor.[6] On the other hand, it was Mr. Smith's testimony that the crack was below the level of the trailer floor, and in any event when he ran the water it dripped down into the belly of the trailer, not onto the floor.[7]

Mr. Smith then removed the P-trap and left the trailer to get a replacement part. While he was gone, Mrs. Robertson began reaching down with a towel into the cut-out area where the P-trap had extended below the bathroom floor, in order to sop up collected water. After filling several buckets with water, she realized that the leaks underneath the trailer might have been caused by water collecting there due to the shower leak. She ran outside, got on her hands and knees and saw the sagging, distended underbelly of the trailer filled with water. "[T]hat's when I could see all the bowing from the front of that trailer clean back almost to the bathroom." When Mr. Smith returned and she showed him the underbelly of the trailer, he purportedly exclaimed: "[O]h boy, I think we found our problem." He then proceeded to cut several slits into the underlining of the trailer in order to let the water drain out. Mrs. Robertson estimated that 100 to 150 gallons of water poured out of the underside of the trailer over several days.

Mr. Smith then proceeded to install the new P-trap and performed a water test on the shower to check for leaks. After the installation of the new P-trap, there were no further shower leaks experienced by the Robertsons. The leak itself was now fixed. Of course, any and all damage caused by the extensive water accumulation still remained.

Shortly thereafter, on November 3, 2003, Mrs. Robertson was on the telephone with Fleetwood, explaining all that had happened, including the water that collected in the underbelly, the apparent water damage, mold, etc., and the failure to repair the shower leak after so many attempts. She requested her money back. She was told that she would have to make an appointment to have the trailer inspected and repaired at Fleetwood's service facility in Rialto, and the earliest appointment was January 19, 2004. After initially agreeing to the appointment with Fleetwood, the Robertsons later cancelled, deciding that because of the extensive water damage and concern about mold, further repair attempts were out of the question. They wanted their money back. Accordingly, no further repairs were sought by the Robertsons, and Fleetwood was not given an opportunity to repair the

---

[6] The shower apparently rests on a base that is elevated above the trailer floor.

[7] Although Smith claimed at trial that the location of the crack was at the lower portion of the P-trap, rather than higher up near the drain, the jury heard prior deposition testimony to the contrary. Additionally, photographs taken by Fleetwood's technical expert, Mr. Olson, appeared to show the upper portion of the P-trap above the trailer floor, as acknowledged by Mr. Olson. Lorna Robertson also testified she observed the crack in the P-trap was above the level of the trailer floor.

newly discovered water damage to the trailer. Fleetwood did not respond to the Robertsons' written demand for repurchase.

Damage to the trailer from the collected water was apparently extensive, including evidence of mold, insulation soaked with water and scum, discoloration of wood beams and subflooring, distention of wood, swelling in portions of the subflooring, etc.

The Robertsons filed their complaint for restitution and damages on January 29, 2004, setting forth a cause of action for violation of the Song-Beverly Act. The jury found that Fleetwood or its authorized repair facility (Visalia RV) failed to repair the consumer good to conform to the warranty after a reasonable number of attempts, and that Fleetwood violated the Song-Beverly Act by its failure to replace or reimburse the plaintiffs' trailer. Furthermore, the violation was found to be willful. The Robertsons were awarded $22,000 for repurchase of the trailer, and $16,000 as a civil penalty against Fleetwood. Judgment on the jury verdict was entered on February 24, 2005. Notice of entry of judgment was served on April 1, 2005. The trial court subsequently awarded attorney fees of $231,187.45 and costs of $22,028.88.[8] Following a denial of a motion for new trial, defendant Fleetwood's notice of appeal was timely filed on May 27, 2005.

## CONTENTIONS ON APPEAL

Fleetwood appeals on several grounds, which may be briefly summarized as follows: (1) There was no substantial evidence to support the jury's finding that Fleetwood or its authorized repair facility (Visalia RV) was given a reasonable number of attempts to repair the nonconformity; (2) the Robertsons failed to comply with the "presentation" element of the Song-Beverly Act as a matter of law; (3) the trial court improperly instructed the jury on the "presentation" element; (4) the trial court erroneously allowed the jury to award "finance charges" as damages; (5) the trial court improperly excluded evidence of Fleetwood's good-faith belief that it was in compliance with the Song-Beverly Act; (6) the trial court improperly allowed lay opinion to establish a connection between the shower leak complained of by plaintiffs and the water accumulation below the trailer floor; and (7) the trial court's award of attorney fees violated section 1794, subdivision (d). These arguments will be considered below in turn.

---

[8] An amended judgment was entered on August 22, 2005, incorporating the award of attorney fees and costs.

## DISCUSSION

### A. Jury's Findings Supported by Substantial Evidence

Fleetwood makes a series of related arguments to the effect that the jury erred as a matter of law in finding that Fleetwood or its authorized repair facility (Visalia RV) was given a reasonable number of attempts to repair the nonconformity. Properly framed, these contentions call for us to determine whether there was substantial evidence to support the jury's verdict.

#### 1. Standard of Review

"When findings of fact are challenged in a civil appeal, we are bound by the familiar principle that 'the power of the appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted,' to support the findings below." (*Oregel v. American Isuzu Motors, Inc.* (2001) 90 Cal.App.4th 1094, 1100 [109 Cal.Rptr.2d 583].) We must therefore view the evidence in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference and resolving all conflicts in its favor. (*Bickel v. City of Piedmont* (1997) 16 Cal.4th 1040, 1053 [68 Cal.Rptr.2d 758, 946 P.2d 427].)

#### 2. The Song-Beverly Act

The Song-Beverly Act is a remedial statute designed to protect consumers who have purchased products covered by an express warranty. (*Jensen v. BMW of North America, Inc.* (1995) 35 Cal.App.4th 112, 121 [41 Cal.Rptr.2d 295].) One of the most significant protections afforded by the act is found at section 1793.2, subdivision (d), which provides with respect to consumer goods that "if the manufacturer or its representative in this state does not service or repair the goods to conform to the applicable express warranties after a reasonable number of attempts, the manufacturer shall either replace the goods or reimburse the buyer in an amount equal to the purchase price paid by the buyer . . . ." (§ 1793.2, subd. (d)(1).)[9] A buyer of consumer goods who is damaged by the manufacturer's failure to comply with the act may bring an action to recover damages and other legal and equitable relief (§ 1794, subd. (a)), and if the buyer proves the violation was willful, the judgment may also include a civil penalty which shall not exceed two times the amount of actual damages. (§ 1794, subd. (c).)

A plaintiff pursuing an action under the Song-Beverly Act has the burden to prove the following elements: (1) the product had a defect or

---

[9] Subdivision (d)(2) of section 1793.2 contains similar protections with respect to new motor vehicles.

nonconformity covered by the express warranty; (2) the product was presented to an authorized representative of the manufacturer for repair; and (3) the manufacturer or its representative did not repair the defect or nonconformity after a reasonable number of repair attempts. (*Oregel v. American Isuzu Motors, Inc., supra*, 90 Cal.App.4th at p. 1101.) The dispute in the present analysis centers on the third element—namely, whether there was substantial evidence to support the jury's finding that the manufacturer or its representative did not repair the nonconformity (i.e., the water leak) after a reasonable number of attempts.

■ The reasonableness of the number of repair attempts is a question of fact to be determined in light of the circumstances, but at a minimum there must be more than one opportunity to fix the nonconformity. (*Silvio v. Ford Motor Co.* (2003) 109 Cal.App.4th 1205, 1208–1209 [135 Cal.Rptr.2d 846] [statute uses plural "attempts"].) Each occasion that an opportunity for repairs is provided counts as an attempt, even if no repairs are actually undertaken. (*Oregel v. American Isuzu Motors, Inc., supra*, 90 Cal.App.4th at p. 1103 [all six occasions on which plaintiff presented vehicle to dealer to find and repair source of oil leak counted as repair attempts, even if only on one occasion were parts replaced].) The *Oregel* court explained that the consumer's obligation is only to give the manufacturer or its representative "a reasonable *opportunity* to repair the vehicle." (*Oregel v. American Isuzu Motors, Inc., supra*, 90 Cal.App.4th at p. 1103.) "Whether or not the manufacturer's agents choose to take advantage of the opportunity, or are unable despite that opportunity to isolate and make an effort to repair the problem, are matters for which the consumer is not responsible." (*Id.* at pp. 1103–1104). Finally, for purposes of calculating the number of repair attempts, no distinction is made between the manufacturer and its authorized repair facility. They are treated as a single entity and their repair efforts are aggregated. (*Ibrahim v. Ford Motor Co.* (1989) 214 Cal.App.3d 878, 889 [263 Cal.Rptr. 64] [instructional error occurred where trial court suggested the manufacturer was entitled to at least one opportunity to fix problem itself, notwithstanding the dealership's many previous efforts to do so].)

### 3. *There Was Substantial Evidence Fleetwood Did Not Repair the Trailer After a Reasonable Number of Attempts*

It is clear there was substantial evidence presented at trial to support the jury's determination that Fleetwood failed to repair the water leak problem within a reasonable number of attempts. As summarized below, the same water leak problem, which manifested itself around the shower area of the

trailer, persisted despite several repair attempts by Mr. Smith of Visalia RV.[10] Lorna Robertson testified that although such measures as adjusting the shower door and resealing the shower were tried, the leak continued unabated following Mr. Smith's repair visits on August 8, 2002, January 24, 2003, and March 10, 2003, and she informed the dealer on numerous occasions after each such visit that the leak was continuing. Mrs. Robertson watched the repair efforts on the above occasions, and she testified that the panel at the base of the shower was never removed to check the P-trap and drain area for leaks. She also saw no pressure or water tests undertaken to check for leaks. In addition, she advised the dealer of the water dripping from the front underneath portion of the trailer in January of 2003 and showed the "drips" to Mr. Smith at the January and March repair visits. Mr. Smith acknowledged reporting in his repair order that the drips could be due to the shower leak. Despite this indication of a potentially larger problem, Mr. Smith did not investigate further. Moreover, Fleetwood's Technical Service Representative, Robert Olson, testified that if a customer complained about leaks underneath a trailer, a trained technician would be expected to perform a pressure test and check the P-trap for leaking.

We find the above testimony, including reasonable inferences, amply supports the jury's finding that Fleetwood failed to repair the water leak problem within a reasonable number of attempts. In other words, there was substantial evidence that by the time the crack in the P-trap and the trailer's waterlogged underbelly were discovered in October of 2003, Fleetwood (through its dealer) had *already* previously failed to correct the water leak problem after a reasonable number of attempts.

### (a) *Replacing P-trap Did Not Repair the Nonconformity*

Fleetwood contends that because it replaced the P-trap in October of 2003, and thereby removed the source of the leak, it fulfilled its repair obligations and thus the buyer's right to replacement or refund under the Song-Beverly Act was never triggered. The argument relies on section 1793.2, subdivision (d)(1), which provides that the buyer's repurchase or replacement remedy only accrues if the manufacturer or its representative "does not service or repair the goods to conform to the applicable express warranties after a reasonable number of attempts." According to Fleetwood, an implication of the above statutory language is that anytime the initial source of the

---

[10] In light of the testimony by Lorna Robertson and others indicating the crack in the P-trap was above the level of the trailer floor, the jury could reasonably infer that the same nonconformity was responsible for both the water leak on the bathroom floor and the water accumulation in the underbelly of the trailer.

nonconformity is identified and repaired (e.g., repairing the leak), the manufacturer has met its obligations under the Song-Beverly Act regardless of other related symptoms or harm that may have resulted (e.g., damage due to water accumulation).

■ We find Fleetwood's argument unpersuasive. Nothing in the statutory language requires a court or jury to adopt such a narrow view of the nonconformity to which the manufacturer's obligations would apply. Moreover, the Song-Beverly Act is a remedial measure intended for protection of consumers and should be given a construction consistent with that purpose. "[T]he Act is manifestly a remedial measure, intended for the protection of the consumer; it should be given a construction calculated to bring its benefits into action." (*Kwan v. Mercedes-Benz of North America, Inc.* (1994) 23 Cal.App.4th 174, 184 [28 Cal.Rptr.2d 371].) ■ Although section 1793.2, subdivision (d)(1) does not provide a definition of the term "nonconformity,"[11] we readily conclude in light of the remedial nature of the statute that it is broad enough to encompass the entirety of the problem in the present case—that is, both leak and water damage. Accordingly, the jury could appropriately find, as it implicitly did here, that the mere repair of the leak in October of 2003 did not cure the entirety of the nonconformity, since the resulting water damage still remained.

As we have previously noted, evidence at trial permitted a reasonable inference that the same condition (the cracked P-trap) caused both the leaking water on the bathroom floor and the flooded underbelly of the trailer. Specifically, testimony by Lorna Robertson and photographs reflected that the crack in the P-trap was above the floor level. When, in light of this evidence, the jury treated the water leak and resulting water accumulation (and damage) as part of the same nonconformity, it was simply acting in its proper role as finder of fact.[12] Thus, Fleetwood's argument ultimately fails because, as already discussed, there was substantial evidence to support the finding that Fleetwood failed to repair the nonconformity after a reasonable number of attempts.

---

[11] In related provisions applicable to new motor vehicles, a "nonconformity" is defined broadly as "a nonconformity which substantially impairs the use, value, or safety of the new motor vehicle." (§ 1793.22(e)(1).) This definition is generally synonymous with what the average person would understand to be a defect. (*Ibrahim v. Ford Motor Co., supra,* 214 Cal.App.3d at p. 887.) In view of the latitude inherent in these provisions, we see no reason that a "nonconformity" may not include an entire complex of related conditions (e.g., cracked pipe *and* water damage).

[12] Issues of the existence and nature of an alleged nonconformity are questions of fact for the jury. (See *Schreidel v. American Honda Motor Co.* (1995) 34 Cal.App.4th 1242, 1250–1251 [40 Cal.Rptr.2d 576] [nonconformity issues in motor vehicle case were questions of fact].)

### (b) *Robertsons Were Not Required to Give Fleetwood an Opportunity to Complete All Repairs*

Fleetwood next argues that because certain repairs were performed at the time of the October 2003 repair visit, it was entitled to complete *all* repairs, including the extensive water damage. On that occasion, the broken P-trap was discovered and fixed, and the underbelly of the trailer slit open to allow the collected water to escape. Thus, according to Fleetwood, repair efforts were already underway and the Robertsons were required to let Fleetwood complete all needed repairs.

The argument falls short in the present case because of the jury's finding, supported by substantial evidence, that Fleetwood failed to repair the nonconformity after a reasonable number of attempts. Implicit in this finding is that the nonconformity was not wholly "fixed" when the leak was repaired. Although the testimony at trial was that Mr. Smith repaired the P-trap and thereby stopped the leak at the October 2003 repair visit, it also showed that the Robertsons learned, at the same time, they had a water-saturated trailer with apparently significant water damage; that is, when the water accumulation, estimated by Lorna Robertson as being between 100 and 150 gallons, was discovered in the underbelly of the trailer, the real extent of the nonconformity (the entire water leak problem) had come to light and was beginning to be grasped. Under such circumstances, the Robertsons were not foreclosed from seeking their repurchase rights under the Song-Beverly Act after the water leak was fixed, because a substantial portion of the nonconformity (i.e., the water damage) continued to exist. Thus, the jury could properly find that the Robertsons were entitled to pursue a reimbursement remedy under the Song-Beverly Act, as demanded in November of 2003, even though a portion of the nonconformity—the broken P-trap—had been repaired.[13]

There is no doubt that the water accumulation and resulting water damage were newly discovered information to *all* parties concerned, including Fleetwood and Visalia RV.[14] But that fact by itself does not entitle Fleetwood

---

[13] Fleetwood insists the broken P-trap (the leak) was the sole nonconformity and the water damage was merely a form of collateral harm separate from the nonconformity itself. Under this view of the facts, the water damage was sufficiently distinct from the broken P-trap that Fleetwood should be given a (further) opportunity to fix it, either because it would be unreasonable under the circumstances to deny a further repair opportunity, or because the water damage should be treated as a new and distinct nonconformity thereby allowing the manufacturer a fresh start in attempting repairs. The jury found to the contrary, and apparently viewed the nonconformity to include the water damage. As noted, substantial evidence existed to support the verdict on this basis.

[14] However, it is common knowledge that a water leak in a home or other structure, if not timely addressed, may cause water-related damage. Thus, although the damage in the present case was newly discovered, it was not entirely unforeseeable.

to a fresh start in counting repair attempts. As we have emphasized, there was sufficient evidence to permit the jury to find the entire water problem (including the water damage) constituted one and the same nonconformity, as opposed to two separate defects. That being the case, Fleetwood's argument that the nonconformity was fully repaired fails.

Further, we reject as unsupported the proposition offered by Fleetwood that repair of one aspect of a nonconforming condition automatically entitles the manufacturer, as a matter of law, to complete all repairs. Quite to the contrary, as the facts of the instant case illustrate, a breach of obligations arising under the Song-Beverly Act may arise under many diverse situations. Suffice it to say that the critical question of whether a reasonable number of attempts was provided, thereby allowing the consumer to forgo further repair attempts and pursue a "replace-or-repurchase" remedy, depends upon the facts and circumstances of each case.

### (c) *There Was Substantial Evidence That Fleetwood Refused to Reimburse the Robertsons*

Next, Fleetwood argues that it never actually refused to repurchase the trailer, but only wanted to examine it further before deciding whether to accede to the Robertsons' demand, and therefore the Robertsons' decision not to allow the trailer to be taken to Rialto (the site of Fleetwood's repair facility) prevented Fleetwood from proceeding further.[15] After hearing the evidence presented at trial, the jury found that Fleetwood willfully failed to replace the trailer or reimburse plaintiffs the appropriate amount of money. We find that substantial evidence supports the jury's finding of refusal to reimburse the Robertsons.

Although Fleetwood contends that the Robertsons prevented Fleetwood from inspecting the trailer, it was undisputed at trial that shortly after the water was found in the underbelly, Tommy Burnett from Visalia RV inspected the trailer, took photographs and stated he would make a verbal and written report to Fleetwood. Burnett was said to be acting as a liaison between the Robertsons and Fleetwood, to report the damage and to set up a repair date with Fleetwood. Additionally, Fleetwood's authorized repair facility, Visalia RV, had been observing the trailer throughout the many repair attempts by its employee, Mr. Smith, which included the discovery of the accumulated water in the underbelly. As to the appointment in Rialto which was scheduled for

---

[15] Fleetwood also notes that once the Robertsons decided the manufacturer should repurchase the trailer, they moved it to a storage yard for a considerable period of time. Fleetwood representative Robert Olson participated in a subsequent investigation of the trailer, but that was not until September of 2004. The bottom panels of the trailer were not sliced off until January of 2005, shortly before trial.

January 19, 2004, although there were mixed signals as to the purpose thereof (i.e., repair versus evaluate for repairs), Lorna Robertson understood from discussions with Fleetwood, which she described to the jury, that repair was the main objective, and a confirming letter from Fleetwood indicated the trailer was scheduled to be transported for service repairs. When the Robertsons cancelled the appointment, it was because they had decided against further repairs and were demanding repurchase. Fleetwood failed to repurchase the trailer pursuant to the Robertsons' oral request on November 3, 2003, and failed to respond in any way to the Robertsons' written demand for repurchase in January 2004.

We conclude from the above summary that substantial evidence supported the jury's findings. Fleetwood's arguments regarding the reasonableness of its conduct when it failed to honor the Robertsons' demand for repurchase were rejected by the jury based on substantial evidence presented at trial.

> (d) *The Robertsons' Failure to Allow Trailer to Be Sent to Rialto Repair Facility Did Not Defeat Their Repurchase Rights*

Fleetwood contends that the Robertsons' refusal to release the trailer to its repair facility in Rialto precludes liability under the Song-Beverly Act for two reasons: (1) It prevented Fleetwood from making examination of the trailer to determine the feasibility of repairs; and (2) it rendered the Robertsons incapable of complying with the statute's "presentation" requirement. The argument is unpersuasive on both counts.

The fact the Robertsons, at the end of a long process of many repair attempts, eventually decided against sending the trailer to Fleetwood's facility in Rialto—whether for repairs or further examination—was merely one circumstance for the jury to consider in making its determination. We decline to hold that, as a matter of law, the "refusal" in this case somehow trumps all other factors. To do so would require us to disregard the testimony of Lorna Robertson and others concerning the several prior repair attempts undertaken by Visalia RV, Fleetwood's authorized repair facility, up to and including the October 2003 visit when the water damage was discovered. Clearly, the jury believed that these past, repeated failures to diagnose and repair the water problem constituted a reasonable number of repair attempts, all of which occurred *prior to* the Robertsons' cancellation of the Rialto appointment. That being the case, the remedies under section 1793.2, subdivision (d)(1) had already accrued, and it was unnecessary for the Robertsons to provide the manufacturer with one last opportunity to examine and repair the trailer. (See *Ibrahim v. Ford Motor Co., supra,* 214 Cal.App.3d 878, 889 [trial court erred

in instructing jury that, notwithstanding the dealership's many previous efforts to repair, the manufacturer was entitled to at least one opportunity to fix problem itself].)

The second part of Fleetwood's argument will require us to examine the "presentation" element of the Song-Beverly Act. We will address that issue separately in the section which follows.

B. *The Presentation Element of the Song-Beverly Act Was Satisfied*

Fleetwood contends the failure to allow the trailer to be sent to the manufacturer defeated the *presentation* requirement of the Song-Beverly Act as a matter of law. As more fully explained below, we conclude that the presentation element of the statute may be satisfied where, as here, a manufacturer or its authorized repair facility has voluntarily elected, with the consumer's consent, to undertake repair efforts at the consumer's residence, thereby providing a reasonable opportunity to make repairs.

In order to prevail in a claim under the Song-Beverly Act, one of the elements a plaintiff must prove is that the good "was presented to an authorized representative of the manufacturer . . . for repair." (*Oregel v. American Isuzu Motors, Inc., supra*, 90 Cal.App.4th at p. 1101.) Often referred to as the "presentation" element (*ibid.*), it is based on subdivision (c) of section 1793.2, which states in relevant part as follows: "The buyer shall **deliver** nonconforming goods to the manufacturer's service and repair facility within this state, unless, due to reasons of size and weight, or method of attachment, or method of installation, or nature of the nonconformity, delivery cannot reasonably be accomplished. If the buyer cannot return the nonconforming goods for any of these reasons, he or she shall notify the manufacturer or the nearest service and repair facility within the state. Written notice of nonconformity to the manufacturer or its service and repair facility shall constitute return of the goods for purposes of this section. Upon receipt of that notice of nonconformity, the manufacturer shall, at its option, service or repair the goods at the buyer's residence, or pick up the goods for service and repair, or arrange for transporting the goods to its service and repair facility. All reasonable costs of transporting the goods when a buyer cannot return them for any of the above reasons shall be at the manufacturer's expense." (Boldface added.)

Fleetwood contends that because the Robertsons never physically *delivered* their trailer to Fleetwood's facility for repair, the presentation requirement was not satisfied.[16]

In opposition, the Robertsons argue that although delivery to the authorized repair facility is the consumer's responsibility under the Song-Beverly Act, that responsibility is met when the repair facility voluntarily agrees to other arrangements for repair of the goods. For example, when a motorist is stranded on the side of the road, a repair facility would be free to attempt repairs under the warranty by going to where the vehicle is stranded, if it chose to do so. And while a consumer is not entitled to insist on "house calls" under the law, an authorized repair service may voluntarily go to the consumer's home or business to attempt repair of a warranted product there. In other words, the Robertsons contend the statute was never intended to prevent the manufacturer or its authorized representative from bringing the repair service *to the consumer*, when it seems practical or convenient to do so, and on such occasions the presentation element should be deemed satisfied to the extent that a reasonable opportunity to repair the product has thereby been provided.

In this regard, the testimony by Allen Wood of Visalia RV reflected that in response to the Robertsons' complaints of a water leak, Visalia RV *willingly* authorized the sending of a repairman to the trailer park rather than insisting that the Robertsons bring their trailer to the dealership. In each of the repair attempts, Mr. Smith of Visalia RV came out to the trailer park and was given full access to the trailer.[17] Under such circumstances, the Robertsons contend the delivery provision was satisfied. We believe the Robertsons' position is correct, as more fully discussed below.

■ Because the presentation element is based on subdivision (c) of section 1793.2, the parties' arguments raise an issue of statutory construction. In construing a statute, the court's fundamental task is to ascertain the intent of the Legislature so as to effectuate the purpose of the law. (*Calatayud v. State of California* (1998) 18 Cal.4th 1057, 1064 [77 Cal.Rptr.2d 202, 959 P.2d 360].) "In analyzing statutory language, we seek to give meaning to every word and phrase in the statute to accomplish a result consistent with the legislative purpose, i.e., the object to be achieved and the evil to be prevented by the legislation." (*Harris v. Capital Growth Investors XIV* (1991) 52 Cal.3d 1142, 1159 [278 Cal.Rptr. 614, 805 P.2d 873]). "If a statute's language is clear, then the Legislature is presumed to have meant what it said, and the plain meaning

---

[16] The Robertsons do not claim to have given written notice in lieu of delivery under the above statutory provisions.

[17] The Robertsons had informed Visalia RV that they lacked a tow vehicle. The Wooden Shoe Trailer Park was less than a mile away from Visalia RV.

of the language governs." (*Kizer v. Hanna* (1989) 48 Cal.3d 1, 8 [255 Cal.Rptr. 412, 767 P.2d 679].) Nevertheless, the language should not be given a literal meaning if doing so would result in absurd consequences that the Legislature did not intend. (*Calatayud v. State of California, supra*, 18 Cal.4th at pp. 1064–1065.)

■ Preliminarily, we note the meaning of subdivision (c) of section 1793.2 is clear in delineating *whose responsibility* it is to deliver the product to the manufacturer or its authorized repair facility. It says *the buyer* shall deliver the nonconforming goods to the repair facility, except that in specified circumstances a consumer may give written notice in lieu of delivery. (See *Ibrahim v. Ford Motor Co., supra*, 214 Cal.App.3d at p. 885 ["Subdivision (c) states the general rule that the buyer is responsible for delivering nonconforming goods to the manufacturer for service or repair . . . ."].) Consequently, a person seeking repair of a product under an express warranty cannot expect or require the manufacturer or its authorized repair facility to make a "house call." Rather, the law places the duty squarely on the consumer to deliver the product to the authorized facility for service and repairs. (§ 1793.2, subd. (c) [the buyer "shall deliver" the nonconforming good to the service and repair facility]; *Jiagbogu v. Mercedes-Benz USA* (2004) 118 Cal.App.4th 1235, 1244 [13 Cal.Rptr.3d 679] ["[T]he act places an affirmative duty on the buyer to deliver a nonconforming product for repair . . . ."].)

■ Section 1793.2, subdivision (c) also specifies there are times when the responsibility *shifts* to the manufacturer to take certain steps to obtain an adequate repair opportunity. That is, where "delivery" cannot be accomplished by the consumer for reasons specified in subdivision (c), and a written notice in lieu of delivery is sent, the manufacturer must undertake one of the following options: (1) service or repair the goods at the buyer's residence, (2) pick up the goods for service and repair, or (3) arrange for transporting the goods to its service and repair facility. (§ 1793.2, subd. (c).) In such instances, the written notice from the buyer "shall constitute return of the goods for purposes of this section" (*ibid.*), thereby shifting the responsibility to the manufacturer to take action (i.e., the "options" above). Whether in a particular case the responsibility to act rests with buyer or manufacturer under the circumstances, the obvious goal in either case is to get the product into the manufacturer's or repair facility's hands in order to ensure there is notice of the nonconformity and an opportunity to repair.

■ Moreover, applicable case law confirms that the legislative purpose for the presentation element is to provide a reasonable opportunity for repairs. (*Oregel v. American Isuzu Motors, Inc., supra*, 90 Cal.App.4th at p. 1101.) Of course, bringing the product to the site of a designated repair facility accomplishes this objective. However, in light of this specific legislative purpose, it is difficult to believe the Legislature intended to rule out "delivery" of

a nonconforming product by other reasonable means, such as where the repair facility agrees to perform the needed repairs at the consumer's residence.

Nevertheless, Fleetwood contends that a broad interpretation does not comport with the actual wording of the statute. It argues the phrase "shall deliver to the manufacturer's service and repair facility" means the buyer must cause the product to be actually delivered or returned to the site of the repair facility. There are indicators in the wording of the statute which lend some support to such an interpretation. First, subdivision (c) of section 1793.2 refers to a delivery "to" what is apparently a physical place, namely "the manufacturer's service and repair facility within this state." Such wording arguably indicates an actual, physical delivery of the product to the service and repair facility is contemplated. Consistent with this interpretation, subdivision (a)(1)(A) of section 1793.2 describes the term "facilities" with reference to their physical site, requiring such facilities to be "reasonably close" to all areas where the manufacturer's goods are sold to carry out the terms of the warranties. Second, the second sentence of subdivision (c), which addresses the situation where the buyer cannot accomplish delivery, uses the alternate phrase "cannot return" the nonconforming goods. It therefore appears the statute is using the words "deliver" and "return" as generally synonymous. Although these are plausible arguments in favor of Fleetwood's proffered interpretation, we are not persuaded that the Legislature intended to exclusively limit the manner by which delivery to the manufacturer or repair facility may be made.

The Robertsons contend that the term "delivery" is a broader concept than mere physical delivery by the consumer to the site of the repair facility, and emphasize that the purpose of the presentation element is to provide a reasonable opportunity to make the needed repairs. They assert that the presentation element of the statute may be satisfied where, as here, a manufacturer or its authorized repair facility has voluntarily elected, with the consumer's consent, to undertake repair efforts at the consumer's residence. We agree, for the reasons noted below.

■ In addressing this contention, it is necessary to consider the meaning of the term "deliver" or "delivery" as used in section 1793.2, subdivision (c). For purposes of statutory interpretation, we generally give words their usual and ordinary meaning. (*California Teachers Assn. v. Governing Bd. of Hilmar Unified School Dist.* (2002) 95 Cal.App.4th 183, 191 [115 Cal.Rptr.2d 323].) ■ The ordinary meaning of the term "deliver" includes to "give, transfer [or] yield possession or control of" or to "hand over" to another (see Webster's 3d New Internat. Dict., *supra*, p. 597). One Court of Appeal opinion described the general idea as causing the goods to be "*presented* to an authorized representative of the manufacturer . . . for repair." (*Oregel v.*

*American Isuzu Motors, Inc., supra*, 90 Cal.App.4th at p. 1101, italics added.) Presumably, then, if the goods are (1) presented, (2) to the manufacturer or its representative, (3) for repair, an adequate "delivery" has occurred.

██ Context is also an important factor. (See § 13.) Here, the context in which the term is being used is to explain what action a consumer must take to trigger the manufacturer's obligation to make repairs and to provide that manufacturer (or its authorized repair facility) with a reasonable opportunity to do so. In light of this context and the accepted range of meaning for the word "deliver," it is reasonable to assume that when a consumer turns over control of the nonconforming goods for repairs to a person authorized by the manufacturer (or its repair facility) to make such repairs, an adequate "delivery" to the manufacturer (or repair facility) has taken place. In such case, the goods have been placed at the disposal of those who are authorized to conduct the repairs. For example, when a repairman from an authorized repair facility comes to a person's home to repair a warranted product and is given sufficient access, possession and control of the product to make the needed diagnosis and repairs in that home, in a real sense there has been a temporary "yielding of possession or control" or a "handing over" of the product to the repairman. Practically speaking, the product has been presented or delivered for repairs to the repairman, even though it never left the consumer's home. Thus, we believe this broader interpretation of delivery is more consistent with common sense and with the purpose of the presentation requirement, which is to provide a reasonable opportunity for repairs. (*Oregel v. American Isuzu Motors, Inc., supra*, 90 Cal.App.4th at p. 1103.)

Moreover, this construction of the presentation element will more adequately effectuate the remedial purpose of the Song-Beverly Act. "[T]he Act is manifestly a remedial measure, intended for the protection of the consumer; it should be given a construction calculated to bring its benefits into action." (*Kwan v. Mercedes-Benz of North America, Inc., supra*, 23 Cal.App.4th 174, 184.) If Fleetwood's narrow interpretation were adopted, a manufacturer could delay indefinitely its refund-or-replace obligations, even after failure to repair within a reasonable number of attempts, by continuing to make "house calls" in hopes the unwary consumer would not realize under the circumstances the need to physically return the product to a repair site. Further, we do not believe the Legislature intended to make "house calls" an exemption from the requirement that a warranted product must be repaired after a reasonable number of attempts.

██ We conclude that the buyer's "delivery" requirement, as a means of fulfilling the presentation element, is satisfied when the manufacturer or its

authorized repair facility makes a service call to the consumer's residence, and thereby obtains from the buyer a reasonable opportunity to repair the product.[18]

Accordingly, the Robertsons' refusal to allow their trailer to be sent to Rialto did not, as a matter of law, negate the presentation element contained in section 1793.2, subdivision (c).[19] The jury properly found that the presentation element was satisfied under the unique circumstances of this case, which included numerous "house calls" by the authorized repair facility.[20]

---

[18] We note this conclusion is further supported by consideration of the *entirety* of subdivision (c) of section 1793.2, upon which the presentation element is based. Viewing subdivision (c) as a whole, it appears to articulate two means of accomplishing the goal of providing a reasonable opportunity to repair. One is the buyer's delivery of the product; the other is undertaken by the manufacturer under specified circumstances and involves one of several "options" (i.e., to either repair the goods at the consumer's residence or pick up the goods for service and repairs). (§ 1793.2, subd. (c).) Both avenues appear to reach the same goal by different routes—namely, the manufacturer obtains access to the product and has an opportunity to make repairs. Of course, the affirmative responsibility is on the buyer to deliver the product to the manufacturer's repair facility. Conversely, the manufacturer has no obligation to perform the pick-up/house call "option" unless, under specified circumstances, delivery cannot reasonably be accomplished and the buyer sends a notice letter in lieu of delivery. (See § 1793.2, subd. (c).) *Nevertheless*, for the purpose of providing a reasonable opportunity to repair the product, the statute would seem to indicate that either method will do.

In other words, although the statute does not *require* the manufacturer to make a house call or pick up goods unless specified conditions are met, the mere fact these "options" are listed in this provision indicates the Legislature thought such "options" would provide the manufacturer a reasonably adequate opportunity to conduct repairs. Presumably, when one of the endorsed "options" in the statute is actually performed (whether or not required), the statute is complied with. That being the case, when a manufacturer or its authorized repair facility voluntarily elects to repair a product by means of making house calls, and thereby gains a reasonable opportunity to repair the goods, the requirements of section 1793.2, subdivision (c) have been fulfilled. (See *Ibrahim v. Ford Motor Co.*, *supra*, 214 Cal.App.3d 878, 889 [repair efforts of the manufacturer *and* its authorized repair facility are treated as though they were one entity].) Therefore, when Visalia RV undertook its many repair efforts at the Robertsons' trailer park, it bypassed "delivery" to its physical site and fulfilled by other means the requirements of subdivision (c). Whether this conclusion is viewed as a broad interpretation of the delivery requirement (see above), or simply as a recognition the statute endorses alternatives to delivery which may be undertaken by the manufacturer, or both, it is clear that subdivision (c), upon which the presentation element is based, has been satisfied.

[19] In so holding, we emphasize there was substantial evidence to support the jury's implicit finding that prior to the Robertsons' "refusal," there had already been more than a reasonable number of repair attempts (by virtue of the many service calls to the trailer) concerning the water leak. Of course, the presentation element is distinct from the element of failure to repair after a reasonable number of attempts. If a manufacturer made several house calls to attempt repair of a product, but it became necessary to bring the product to the repair facility in order to effect the repairs, a "refusal" by the consumer would clearly be relevant to the latter element. And, in any event, *both* elements remain issues of fact for the jury.

[20] We note in passing that an alternative ground may exist for supporting the verdict based on the principles of *waiver*. Although we do not rely on waiver as a basis for our decision herein, we mention it as instructive that several grounds exist for reaching the same result. A

## C. *No Prejudicial Error in Court's Instruction on Presentation Element*

In instructing the jury in regard to the Song-Beverly Act cause of action, the trial court modified the jury instruction found at Judicial Council of California Civil Jury Intructions (2006) CACI No. 3200, by substituting the word "presented" for repair in place of "delivered" for repair in connection with the presentation element. The judge believed the agreement to repair the trailer at the Wooden Shoe Trailer Park was sufficient to constitute delivery, but modified the instruction because under the circumstances the word "delivery" might mislead the jury. The instruction given by the court was as follows: "That Francis and Lorna Robertson presented the trailer to Fleetwood Travel Trailers or its authorized repair facilities for repair." Fleetwood objected because the instruction departed from the statutory language.

We review by determining if an error in the jury instruction existed and caused prejudice. (Code. Civ. Proc., § 475). "Under article VI, section 13 of the California Constitution, if there is error in instructing the jury, the

waiver is an "intentional relinquishment or abandonment of a known right." (*Bickel v. City of Piedmont, supra*, 16 Cal.4th 1040, 1048.) "The doctrine of waiver is generally applicable to all the rights and privileges to which a person is legally entitled, including those conferred by statute unless otherwise prohibited by specific statutory provisions." (*Outboard Marine Corp. v. Superior Court* (1975) 52 Cal.App.3d 30, 41 [124 Cal.Rptr. 852].) In this regard, section 3513 provides: "Anyone may waive the advantage of a law intended solely for his benefit. But a law established for a public reason cannot be contravened by a private agreement."

In the present case, even assuming an "actual delivery" of the goods to the site of the repair facility was otherwise required, the delivery requirement is apparently for the benefit of the manufacturer (or its repair facility)—i.e., to provide it with a reasonable opportunity to make repairs under the warranty. Further, the Song-Beverly Act only prohibits waiver by the buyer of the provisions of the act. (§ 1790.1.) Accordingly, if the manufacturer (or its repair facility) elects to make other arrangements to provide a reasonable opportunity to perform repairs, it may forgo or waive the benefit of the statutory delivery provision. Here, the testimony of Allen Wood of Visalia RV indicated awareness that customers requesting repairs under warranty must bring their trailer or RV to Visalia RV's facility, but Visalia RV was willing on occasion to conduct repairs at the Wooden Shoe Trailer Park as they did for the Robertsons, "if the job can be done there," because it was so close by and as a convenience to the customers. This was sufficient to establish that any right to insist on actual delivery was waived when Visalia RV made its numerous service calls to the Robertsons' trailer park. Although not raised as a basis for the trial court's decision, if the result of the trial court was correct on any theory, the judgment may be affirmed. (See *Estate of Beard* (1999) 71 Cal.App.4th 753, 776–777 [84 Cal.Rptr.2d 276].)

The same circumstances would appear to create an estoppel. That is, to the extent a delivery to the site of the repair facility was required, the words and conduct of Visalia RV indicated such delivery was not necessary and so it and Fleetwood are estopped to claim otherwise. (See 13 Witkin, Summary of Cal. Law (10th ed. 2005) Equity, §§ 190–194, pp. 527–535.)

Nevertheless, we do not rely on the waiver or estoppel arguments in reaching our decision herein, and rest our opinion solely on the interpretation of the statute articulated above, since the parties neither raised nor briefed those issues. (See Gov. Code, § 68081.)

judgment shall be reversed only when the reviewing court, 'after an examination of the entire cause, including the evidence,' concludes that the error 'has resulted in a miscarriage of justice.' " (*Mitchell v. Gonzales* (1991) 54 Cal.3d 1041, 1054 [1 Cal.Rptr.2d 913, 819 P.2d 872].) That is, we must determine whether "it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)

We do not discern any instructional error. First, we note that in *Oregel v. American Isuzu Motors, Inc., supra,* 90 Cal.App.4th at page 1101, the court used the term "presented" in summarizing this element, and referred to it as the "presentation element." This confirms that the two words are roughly equivalent, and use of the word "presented" would not be likely to mislead a jury. Second, as we have concluded above, the presentation element was satisfied under the particular facts of this case, including under a broad interpretation of delivery requirement. Even if the word "delivery" should have been used, certainly no prejudice resulted from the instruction under the circumstances. Accordingly, we conclude that Fleetwood's appeal on this ground fails.

## D. *Damages for Finance Charges*

Fleetwood next contends the court improperly instructed the jury that the Robertsons could recover "finance charges" as part of their damages, and the jury improperly awarded such damages. Fleetwood refers to section 1793.2, subdivision (d)(1), which provides that the buyer's reimbursement remedy shall be "in an amount equal to the purchase price paid by the buyer, less that amount directly attributable to use by the buyer prior to the discovery of the nonconformity." Since there is no express provision allowing for recovery of finance charges associated with the purchase price, allegedly they were not recoverable. We disagree.

The term "finance charge" is generally understood to be "[a]n additional payment, usually in the form of interest, paid by a retail buyer for the privilege of purchasing goods or services in installments." (Black's Law Dict. (8th ed. 2004) p. 662.) In the present case, there is no dispute that the Robertsons, after paying a downpayment, obtained financing for the balance of the purchase price, which financing was arranged or facilitated by the dealer at the point of purchase. Thus, the monies paid by the Robertsons for their trailer included finance charges. The question before us is whether such finance charges were intended by the Legislature to be included in the reimbursement remedy set forth at section 1793.2, subdivision (d)(1), which allows reimbursement in "an amount equal to the purchase price paid by the buyer."

In *Mitchell v. Blue Bird Body Co.* (2000) 80 Cal.App.4th 32 [95 Cal.Rptr.2d 81], the Court of Appeal addressed the issue of whether "the buyer of a new motor vehicle may recover paid finance charges from the manufacturer when electing the statute's refund remedy." (*Id.* at p. 35.) The court concluded that although the applicable provisions of the Song-Beverly Act did not expressly mention recovery of finance charges, they were nevertheless recoverable because: (1) the act must be construed broadly to effectuate its remedial purpose, and (2) a remedy characterized as "restitution" should afford complete relief. (80 Cal.App.4th at pp. 35–37.) The Legislature's failure to list paid finance charges among other items in the statute was not determinative: "A more reasonable construction is that the Legislature intended to allow a buyer to recover the entire amount actually expended for a new motor vehicle, including paid finance charges, less any of the expenses expressly excluded by the statute." (*Id.* at p. 37.) In so holding, the court also noted that sales of motor vehicles generally involve financing, and there must be a passage of time (i.e., a reasonable number of repair attempts) before a buyer can exercise the refund remedy. (*Id.* at p. 38.) Indeed, in that case (a purchase of a motor home), "the finance charges constitute[d] the bulk of the money plaintiffs paid to acquire the motor home." (*Id.* at p. 39.)

The *Mitchell* case involved a distinct provision in the statute regarding refunds in the context of new motor vehicle purchases, which is set forth at section 1793.2, subdivision (d)(2). The instant case did not involve a new motor vehicle, therefore the applicable refund remedy is set forth at section 1793.2, subdivision (d)(1). The language of the two refund provisions is not identical. Subdivision (d)(1) requires reimbursement "in an amount equal to *the purchase price paid* by the buyer." (§ 1793.2, subd. (d)(1), italics added.) On the other hand, subdivision (d)(2)(B) provides, with respect to new motor vehicle refunds, that the manufacturer "shall make *restitution* in an amount equal to *the actual price paid or payable* by the buyer." (§ 1793.2, subd. (d)(2)(B), italics added.) The court in *Mitchell* was construing the latter provision when it held "the Legislature intended to allow a buyer to recover *the entire amount actually expended* for a new motor vehicle, *including paid finance charges*, less any of the expenses expressly excluded by the statute." (*Mitchell v. Blue Bird Body Co., supra*, 80 Cal.App.4th at p. 37, italics added.)

One apparent reason for the different wording of the refund remedy concerning new motor vehicles is the existence of significant expenses at the time of such purchases that are over and above the actual purchase price, such as license fees, registration fees, sales taxes, transportation charges, and separate charges for manufacturer-installed options, etc.[21] Section 1793.2,

---

[21] The distinct wording came in connection with a series of amendments in which the Legislature "systematically attempted to address warranty problems unique to motor vehicles." (*Jensen v. BMW of North America, Inc., supra*, 35 Cal.App.4th at p. 124.)

subdivision (d)(2)(B) expressly lists such items as recoverable under the restitution remedy concerning new motor vehicles. This same logic provides at least partial explanation for the Legislature's use of the words "make restitution" of the "actual price paid or payable by the buyer" in regard to new motor vehicles (*ibid.*), which would serve to enlarge the reimbursement remedy beyond the "purchase price paid" (§ 1793.2, subd. (d)(1)).

Whatever the extent of the differences between the two provisions, it is clear that both would at least require a refund of the *purchase price*. Although the *Mitchell* case dealt with the question in light of what is clearly a broader refund provision, that does not mean that the term "purchase price paid" as used in section 1793.2, subdivision (d)(1) does not include finance charges.

 We conclude that for purposes of the reimbursement remedy under section 1793.2, subdivision (d)(1), the term "purchase price paid" includes finance charges incurred in conjunction with the purchase. We adopt this interpretation as a reasonable, commonsense understanding of the terminology, and because it best effectuates the remedial purpose of the Song-Beverly Act. When a seller allows payment to be made on credit or in installments over time, it is reasonable to characterize the amounts paid as the buyer's "purchase price,"[22] especially when that term is being defined for purposes of what is essentially a restitution remedy. Finally, the remedial purposes of the Song-Beverly Act would be impeded if finance charges were not recoverable, because often the bulk of the monies paid to acquire expensive consumer goods (such as a travel trailer) are in the form of finance charges. (See *Mitchell v. Blue Bird Body Co., supra*, 80 Cal.App.4th at pp. 38–39.) We presume the Legislature was aware of these financial realities when it provided for reimbursement of the purchase price paid. For all of these reasons, we hold that finance charges are recoverable under the reimbursement remedy set forth at section 1793.2, subdivision (d)(1). Therefore, the trial court did not err in allowing the jury to award finance charges as damages to the Robertsons.

## E. *Exclusion of Evidence Was Not Reversible Error*

Fleetwood argues the exclusion of certain evidence bearing on whether it committed a willful violation of the Song-Beverly Act constituted reversible

[22] In other contexts as well, finance charges are treated as part of the total purchase price. For example, a finance charge imposed by a seller (in a "retail installment sale"), as an amount which allows a buyer to make payments over time in installments, may be fairly characterized as part of the total sales price. (§§ 1802.9–1802.10 [defining finance charges by merchant as part of total sales price for purposes of Unruh Act financial disclosures]; see also *Southwest Concrete Products v. Gosh Construction Corp.* (1990) 51 Cal.3d 701, 705 [274 Cal.Rptr. 404, 798 P.2d 1247] ["time-price" doctrine avoids usury law in bona fide credit sales, since finance charges are terms of the sale itself].)

error. The trial court granted the Robertsons' motion in limine No. 1, which was to exclude "evidence regarding whether the subject vehicle can be repaired, the cost to repair it or how it could be repaired." In granting the motion, the trial court reasoned that the relevant issues in the case were the existence of a nonconformity and whether the manufacturer was unable to repair after a reasonable number of attempts. It held that evidence concerning "prospective repairs," or "whether defendants can presently repair the trailer or whether such repairs could be accomplished easily or inexpensively, [is] not relevant." Fleetwood argues the evidentiary ruling was in error and prevented it from presenting evidence relevant to its good-faith belief that it was not in violation of the Song-Beverly Act.

In *Kwan v. Mercedes-Benz of North America, Inc., supra,* 23 Cal.App.4th 174, 185, the court explained that evidence tending to show the good faith of the manufacturer is admissible:

"[A] violation is not willful if the defendant's failure to replace or refund was the result of a good faith and reasonable belief the facts imposing the statutory obligation were not present. This might be the case, for example, if the manufacturer reasonably believed the product *did* conform to the warranty, or a reasonable number of repair attempts had not been made, or the buyer desired further repair rather than replacement or refund.

"Our interpretation of section 1794(c) is consistent with the general policy against imposing forfeitures or penalties against parties for their good faith, reasonable actions." (*Kwan v. Mercedes-Benz of North America, Inc., supra,* 23 Cal.App.4th at p. 185.)

In the present case, the excluded testimony regarding Fleetwood's belief that it could readily repair the water-damaged trailer, including the nature and details of those prospective repairs, would appear to be relevant to the question of Fleetwood's good faith. Under the particular facts of this case, the evidence was relevant to Fleetwood's belief that it had not yet been given a reasonable number of repair attempts. We therefore agree with Fleetwood that the exclusion of this evidence on relevancy grounds was error.

Whether the trial court's error constitutes grounds for reversal depends on whether the error constituted a miscarriage of justice. (*Clifton v. Ulis* (1976) 17 Cal.3d 99, 105–106 [130 Cal.Rptr. 155, 549 P.2d 1251]; Evid. Code, § 354.) A miscarriage of justice should be declared only when the court concludes there is a reasonable probability that a result more favorable to the appealing party would have been reached in the absence of the error. (*People v. Watson, supra,* 46 Cal.2d 818, 836.)

The Robertsons point out that notwithstanding the court's evidentiary ruling, Fleetwood was allowed to present *some* evidence and argu-

ment regarding its belief that it could repair the trailer and that Mr. and Mrs. Robertson prevented it from doing so. For example, in his opening statement, Fleetwood's counsel told the jury that Dave Matzenger, who is in charge of warranty matters for Fleetwood, would testify that his company is "ready, willing and able to repair the trailer for Mr. and Mrs. Robertson" and that "all they have to do is allow it to be brought into our facility." Mr. Matzenger testified at trial concerning four or five similar incidents of water damage due to water accumulation, all of which were repaired with satisfactory results, and he clearly testified that Fleetwood remains willing to honor its warranty to fix the trailer, "if they'll let us." In closing statements, Fleetwood's counsel argued that his client acted in good faith belief that "we could get this unit fixed, and that repairs would solve the problem," and "that was the reason why we were not buying back immediately when they asked for it[.] [¶] . . . [¶] We offered to take it down, look at, fix it, not at their expense."

In light of the above evidence and arguments that *were* presented to the jury, it appears that Fleetwood's belief and prior experience that it could readily repair the trailer was brought out at trial. The rejected evidence was arguably cumulative.[23] On balance, the exclusion of evidence did not result in a miscarriage of justice.

F. *There Was No Improper Admission of Lay Opinion Evidence*

Fleetwood claims that the trial court impermissibly allowed lay opinion in regard to the source of the water problem. The argument is without merit. There was both photographic evidence and testimony from Lorna Robertson and Robert Olson that the crack in the P-trap appeared to be *above* the interior floor level of the trailer. On cross-examination, prior testimony of Mr. Smith indicated the break in the P-trap was located at the upper portion thereof, near the drain. Furthermore, the Robertsons testified that after the P-trap was fixed, they did not have any more leaks or puddles on the floor of the bathroom. No special expertise was needed to infer that water leaking from a crack situated above floor level might leak or splash onto the shower floor. Because of the evidence the P-trap was above floor level, and the shower leak was fixed when the P-trap was repaired, a reasonable inference was properly drawn by the jury that the broken P-trap was the source of the trailer's water problems—including the shower area and the water accumulation below.

---

[23] Counsel for the defense asked his client's dispute resolution administrator, Mr. Dave Matzenger, whether the problem with plaintiffs' vehicle could be repaired. Plaintiffs' counsel objected citing the order in limine. The court, however, sustained the objection on the grounds that the question called for cumulative evidence, not because the question violated the order in limine.

### G. *Attorney Fees Issues*

In ruling on the Robertsons' attorney fees motion, the trial court awarded a total of $231,187.45 in fees. The amount was based on $145,080.50 in fees incurred through trial, times a "multiplier" of .50 for a subtotal of $217,620.75, plus an additional $13,566.70 in fees attributable to the motion for attorney fees. Fleetwood argues that the trial court failed to follow the statutory requirements in regard to the award of attorney fees. We review for abuse of discretion. (*PLCM Group, Inc. v. Drexler* (2000) 22 Cal.4th 1084, 1095–1096 [95 Cal.Rptr.2d 198, 997 P.2d 511].)

On the issue of attorney fees recoverable by the buyer, section 1794, subdivision (d) provides as follows: "If the buyer prevails in an action under this section, the buyer shall be allowed by the court to recover as part of the judgment a sum equal to the aggregate amount of costs and expenses, including attorney's fees based on actual time expended, determined by the court to have been reasonably incurred by the buyer in connection with the commencement and prosecution of such action." The remedial purpose of this section is readily apparent. "By permitting prevailing buyers to recover their attorney fees in addition to costs and expenses, our Legislature has provided injured consumers strong encouragement to seek legal redress in a situation in which a lawsuit might not otherwise have been economically feasible." (*Murillo v. Fleetwood Enterprises, Inc.* (1998) 17 Cal.4th 985, 994 [73 Cal.Rptr.2d 682, 953 P.2d 858].)

■■■ The plain wording of the statute requires the trial court to base the fee award upon actual time expended on the case, as long as such fees are *reasonably* incurred—both from the standpoint of time spent and the amount charged. As summarized in *Nightingale v. Hyundai Motor America* (1994) 31 Cal.App.4th 99, 104 [37 Cal.Rptr.2d 149], with respect to hourly fee cases: "It requires the trial court to make an initial determination of the actual time expended; and then to ascertain whether under all the circumstances of the case the amount of actual time expended and the monetary charge being made for the time expended are reasonable. These circumstances may include, but are not limited to, factors such as the complexity of the case and procedural demands, the skill exhibited and the results achieved. If the time expended or the monetary charge being made for the time expended are not reasonable under all the circumstances, then the court must take this into account and award attorney fees in a lesser amount." In the situation of a *contingency fee* arrangement, the court in *Nightingale* stated, "for purposes of section 1794, subdivision (d), a prevailing buyer represented by counsel is entitled to an award of reasonable attorney fees for time reasonably expended by his or her attorney." (*Nightingale v. Hyundai Motor America, supra*, 31 Cal.App.4th at p. 105, fn. 6.) In either case, a prevailing party has the burden

of showing that the fees incurred were reasonably necessary to the conduct of the litigation, and were reasonable in amount. (*Levy v. Toyota Motor Sales, U.S.A., Inc.* (1992) 4 Cal.App.4th 807, 816 [5 Cal.Rptr.2d 770].)

In attacking the attorney fee award in the instant case, Fleetwood first contends that the award is improper because the Robertsons did not "incur" any attorney fees. The argument is apparently based on the fact that there was a contingent fee arrangement. We reject Fleetwood's contention. Under fee-shifting provisions contained in remedial statutes, courts have routinely allowed fees to be recovered to compensate for legal services performed for a client even though the client did not have a personal obligation to pay for such services out of his or her own assets. (See *Lolley v. Campbell* (2002) 28 Cal.4th 367, 373 [121 Cal.Rptr.2d 571, 48 P.3d 1128]; *Hayward v. Ventura Volvo* (2003) 108 Cal.App.4th 509, 510–513 [133 Cal.Rptr.2d 514] [contingency fee contract].)

Furthermore, Fleetwood's reliance on *Nightingale v. Hyundai Motor America* concerning this issue is misplaced. In *Nightingale*, the attorney charged her client at an hourly rate of $120, with a provision for increases in the hourly rate over time. According to the attorney, her hourly rate increased to $210 in 1992, but she nevertheless did not pass the increase along to Nightingale and continued to bill her at the lower rate. The trial court, in awarding attorney fees, calculated based on the higher rate. (*Nightingale v. Hyundai Motor America, supra,* 31 Cal.App.4th at p. 103.) The defendant appealed, arguing the increase in fees was not actually "incurred" by the buyer as required by the statute, since the buyer was not billed for, nor under any obligation to pay for, her attorney services at the higher rate. The Court of Appeal agreed, holding that the statute only allows for recovery of attorney fees which have been " 'reasonably incurred by the buyer,' " which means to " 'become liable for . . . .' " (*Id.* at p. 104.) In so holding, the court was ruling in the context of an hourly, noncontingent fee contract. In situations of a contingent fee agreement, *Nightingale* expressly allowed that the buyer's attorney would be entitled to "an award of reasonable attorney fees for time reasonably expended by his or her attorney." (*Nightingale v. Hyundai Motor America, supra,* at p. 105, fn. 6.)

Next, Fleetwood contends that the trial court erred in applying a fee enhancement or multiplier in the instant case. We disagree. As more fully explained hereafter, the statutory language of section 1794, subdivision (d), is reasonably compatible with a lodestar adjustment method of calculating attorney fees, including use of fee multipliers. Since our Supreme Court has held that the lodestar adjustment method is the prevailing rule for statutory attorney fee awards to be applied in the absence of clear legislative intent to the contrary (*Ketchum v. Moses* (2001) 24 Cal.4th 1122, 1135–1136 [104

Cal.Rptr.2d 377, 17 P.3d 735]), we conclude it is applicable to attorney fee awards under section 1794, subdivision (d).

 In *Serrano v. Priest* (1977) 20 Cal.3d 25 [141 Cal.Rptr. 315, 569 P.2d 1303] (*Serrano III*), the Supreme Court affirmed that a trial court has inherent equitable power to award fees under the private attorney general theory. (*Id.* at pp. 42–47.) In considering the *amount* of the award, the *Serrano III* court approved the touchstone or lodestar adjustment method. That method requires the trial court to first determine a touchstone or lodestar figure based on a careful compilation of the actual time spent and reasonable hourly compensation for each attorney. (*Id.* at pp. 48–49.) The touchstone figure may then be augmented or diminished by taking various relevant factors into account, including (1) the novelty and difficulty of the questions involved and the skill displayed in presenting them; (2) the extent to which the nature of the litigation precluded other employment by the attorneys; and (3) the contingent nature of the fee award, based on the uncertainty of prevailing on the merits and of establishing eligibility for the award. (*Id.* at pp. 48–49.) As the Supreme Court subsequently explained, the initial lodestar amount is based on the reasonable rate for *noncontingent* litigation of the same type, which amount may then be enhanced (e.g., through use of a so-called multiplier) to account for factors such as the contingent nature of the case: "The purpose of such adjustment is to fix a fee at the fair market value for the particular action. In effect, the court determines, retrospectively, whether the litigation involved a contingent risk or required extraordinary legal skill justifying augmentation of the unadorned lodestar in order to approximate the fair market rate for such services." (*Ketchum v. Moses, supra*, 24 Cal.4th at p. 1132.)

 In *Ketchum v. Moses, supra*, 24 Cal.4th 1122, the Supreme Court held that the lodestar adjustment method articulated in *Serrano III* is the general rule to be applied in calculating statutory attorney fee awards, unless the particular statute in question calls for another method of calculation. (*Id.* at pp. 1135–1136.) It emphasized that "when the Legislature has intended to preclude fee enhancements, it has done so expressly." (*Id.* at p. 1139.) In construing the statute before it (i.e., § 425.16), the Supreme Court concluded that "because the . . . provisions refer to attorney fees and costs without indicating any restrictions on how they are to be calculated, we accordingly presume that the Legislature intended courts use the prevailing lodestar adjustment method." (24 Cal.4th at p. 1136.) However, the court noted that there was no "blanket" lodestar rule, and "every fee-shifting statute must be construed on its own merits . . . ." (*Id.* at p. 1136.)

In the present case, the attorney fee statute provides that fees must be based on "actual time expended" and "determined by the court to have been

reasonably incurred." (§ 1794, subd. (d).) This particular wording was adopted by statutory amendment in 1978 (Stats. 1978, ch. 991, § 10, p. 3065). While the California legislative history does not explain the intent of the 1978 amendment to the attorney fees provision, it is noteworthy that the language of the 1978 amendment is identical to the attorney fee provision contained in the Magnuson-Moss Warranty Act passed by Congress in 1975 (see 15 U.S.C. § 2310(d)(2)). We also note that the phrase "based on actual time expended" as used by Congress in the Magnuson-Moss Warranty Act had a definite purpose. In *Drouin v. Fleetwood Enterprises* (1985) 163 Cal.App.3d 486, 493 [209 Cal.Rptr. 623], the Court of Appeal explained the intent of Congress in using this particular wording: "Defendant also argues that the amount of attorneys fees awarded by the court is excessive when compared to plaintiff's recovery. Title 15 United States Code section 2310(d)(2), clearly provides that attorneys fees be calculated upon 'actual time expended.' The Senate Report concerning this language makes its purpose clear: 'It should be noted that an attorney's fee is to be based upon actual time expended rather than being tied to any percentage of the recovery. This requirement is designed to make the pursuit of consumer rights involving inexpensive consumer products economically feasible.' (Sen. Rep. No. 93-151, 1st Sess., pp. 23–24 (1973).) We believe this rationale applies with equal force to purchases of products which may not be 'inexpensive.' The trial court did not err in calculating attorneys fees based on actual time expended." (*Drouin v. Fleetwood Enterprises, supra*, 163 Cal.App.3d at p. 493.)

 When the California Legislature adopted the same distinctive terminology as the federal statute, it is reasonable to conclude the intent was the same—i.e., to make sure attorney fees awards would be based on actual time expended, rather than a percentage of the recovery, so that pursuit of consumer warranty cases would be economically feasible.

In light of this legislative objective, it does not appear the particular wording of section 1794, subdivision (d), was intended to preclude consideration of the factors used in the lodestar multiplier approach, as long as the fee award is based on "actual time expended" and is "reasonably incurred." Since the lodestar adjustment method *is* based on actual, reasonable attorney time expended as the objective starting point of the analysis (see *Ketchum v. Moses, supra*, 24 Cal.4th at pp. 1131–1132 [analysis begins with lodestar figure based on " 'careful compilation of the time spent' " and " 'reasonable hourly compensation' " of each attorney]), it is compatible with this statutory provision.

Although no published California case has directly addressed the issue of whether a fee multiplier is permissible under section 1794, subdivision (d),

we note that the Seventh Circuit, in *Skelton v. General Motors Corp.* (7th Cir. 1988) 860 F.2d 250, held that the statutory language of the Magnuson-Moss Warranty Act attorney fee provision is consistent with the use of a multiplier: "GM contends, however, that the express language of the fee-shifting provision of the Magnuson-Moss Act prevents courts from awarding fee enhancers. This provision provides that attorneys' fees should be 'based on actual time expended.' 15 U.S.C. § 2310(d)(2). [Citation.] In our view, these words do not preclude a risk multiplier. Instead, they indicate Congress' intent that attorneys' fees be computed on an hourly basis 'rather than being tied to any percentage of recovery.' S. Rep. No. 986, 92d Cong., 1st Sess. 21, 117 Cong. Rec. 39614 (1971). [Citation.] Because a risk enhancer is applicable to the lodestar—it multiplies the lodestar by a number representing the probability of loss—it is based on the number of hours the attorneys worked and not the size of plaintiff's recovery. Thus a risk multiplier is 'based on actual time expended.' " (*Skelton v. General Motors Corp., supra,* 860 F.2d at p. 257.)[24]

We concur with this analysis. As noted, the lodestar adjustment method *is* based on actual time expended by the attorney, since that is the beginning point of the analysis (*Ketchum v. Moses, supra,* 24 Cal.4th at pp. 1131–1132), and therefore, the statutory wording is reasonably compatible with the lodestar method. Additionally, Fleetwood has failed to demonstrate through legislative history or case precedent that the provision was intended to exclude the use of fee multipliers, and we have found nothing to indicate such an intent. Because the lodestar adjustment method is the prevailing rule for calculation of statutory attorney fees unless the statute expressly indicates a contrary intent, and no such contrary intent is apparent, we conclude that the lodestar method is applicable to section 1794, subdivision (d). We therefore reject Fleetwood's contention that the court abused its discretion by applying a lodestar fee multiplier.

Fleetwood urges that *Levy v. Toyota Motor Sales, U.S.A., Inc., supra,* 4 Cal.App.4th 807 prohibits the use of fee multipliers under the Song-Beverly Act. We disagree. In *Levy,* the trial court's reduction of claimed attorney fees in a Song-Beverly Act case was upheld. The trial court found that the claimed attorney fees of $137,459 were excessive, and reduced the award to $30,000. Plaintiff appealed, contending that the trial court abused its discretion and was required to apply a "lodestar" enhancement or multiplier. The Court of Appeal rejected the arguments and affirmed the trial court's fee award. (4

---

[24] The U.S. Supreme Court decided in *Burlington v. Dague* (1992) 505 U.S. 557 [120 L.Ed.2d 449, 112 S.Ct. 2638] that fee multipliers are no longer appropriate under federal fee-shifting statutes. The California Supreme Court declined to follow that decision regarding attorney fee awards under California statutes. (*Ketchum v. Moses, supra,* 24 Cal.4th at pp. 1136–1138.)

Cal.App.4th at pp. 813–816.) The main point of the decision appears to be that the trial court in its discretion was not *required* to apply a multiplier, and moreover, there was no showing that it abused its discretion in reducing the fee award. In finding it was unnecessary for the trial court to use a lodestar approach in that case, the court pointed out "our case did not involve a contingent fee arrangement," it was not a private attorney general case, and it appeared the trial court complied with the statute (and with Code Civ. Proc., § 1033.5) by awarding fees that in its discretion were found to be reasonably incurred. (4 Cal.App.4th at pp. 813–816.) Unlike the situation in *Levy*, the present litigation was handled based on a contingent fee arrangement. Also, while *Levy* indicated a court is not required to apply a multiplier, it did not say that use of a multiplier would constitute an abuse of discretion. Finally, we must also bear in mind that *Levy* was decided before *Ketchum v. Moses* held that the lodestar analysis was the prevailing method of calculating statutory attorney fees awards.

 Although we conclude that the use of a multiplier is authorized in awarding attorney fees under the Song-Beverly Act, we nevertheless will remand the case to the trial court to recalculate the award of fees. It appears from our review of the proceedings below that the trial court considered some of the same factors in reaching the lodestar amount as it did in applying a multiplier. The trial court considered three factors in finding the hourly rate reasonable: 1) rates approved in other cases, 2) risk arising from contingency, and 3) risk/expense arising from delay in payment. The court also used factors 2 and 3 to justify the .50 multiplier. This duplication is not permitted because it results in unfair double counting and an unreasonable fee award. As stated in *Ketchum v. Moses*, "We emphasize that when determining the appropriate enhancement, a trial court should not consider these factors to the extent they are already encompassed within the lodestar." (*Ketchum v. Moses, supra*, 24 Cal.4th at pp. 1138–1139.)

In regard to the remaining claims of error concerning the amount of attorney fees, we are unable to conclude from the record that an abuse of discretion occurred. The trial judge carefully reviewed the attorney invoices for legal services performed, and weighed and considered numerous factors[25] in reaching its determination as to the amount reasonably incurred. "The amount of an attorney fee to be awarded is a matter within the sound discretion of the trial court. [Citations.] The trial court is the best judge of the value of professional services rendered in its court, and while its judgment is subject to our review, we will not disturb that determination unless we are

---

[25] Fleetwood contends the trial judge improperly considered evidence of its settlement offer, which was so low the judge felt it was not meaningful. Fleetwood failed to object to this evidence in the trial court. Further, we note that Evidence Code section 1152 only prohibits use of such evidence to prove liability.

convinced that it is clearly wrong." (*Akins v. Enterprise Rent-A-Car Co.* (2000) 79 Cal.App.4th 1127, 1134 [94 Cal.Rptr.2d 448].)

## DISPOSITION

The case is remanded to the trial court for a redetermination of the attorney fees award without considering the same factors in computing the lodestar and the fee enhancement. In all other respects, the trial court's judgment is affirmed. Costs are awarded to plaintiffs.

Levy, Acting P. J., and Dawson, J., concurred.

A petition for a rehearing was denied December 4, 2006, and appellant's petition for review by the Supreme Court was denied February 7, 2007, S148905.