Filed 1/29/21

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| TANIA PULLIAM,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>HNL AUTOMOTIVE INC. et al.,<br><br>    Defendants and Appellants. | B293435<br><br>(Los Angeles County<br>Super. Ct. No. BC633169) |

APPEAL from an order of the Superior Court of Los Angeles County, Barbara M. Scheper, Judge.  Affirmed.

McCreary, PC and Duncan J. McCreary; McGuirewoods, Leslie M. Werlin, Jamie D. Wells and Anthony Q. Le for Defendants and Appellants.

Rosner, Barry & Babbit, Hallen D. Rosner, Arlyn L. Escalante and Serena D. Aisenman for Plaintiff and Respondent.

———————————————

## *INTRODUCTION*

Defendants HNL Automotive Inc. and TD Auto Finance, LLC (TD) appeal the trial court's award of attorney's fees to plaintiff following a jury trial on plaintiff's lemon law claims. Defendants argue: (1) plaintiff's counsel failed to provide evidence of their hourly rates, (2) the trial court erred in refusing to apportion attorney's fees, (3) the trial court erred in applying a lodestar multiplier, and (4) TD was not liable for attorney's fees under title 16, section 433.2 of the Code of Federal Regulations (2020) (the Holder Rule). We affirm the amount of attorney's fees awarded, finding no abuse of discretion. We affirm the court's ruling that TD is liable for attorney's fees, and conclude that the Holder Rule does not limit the attorney's fees that a plaintiff may recover from a creditor-assignee.

## *FACTS AND PROCEDURAL BACKGROUND*

## 1. *Plaintiff's Vehicle Purchase*

In July 2016, plaintiff purchased a "Certified Pre-Owned" 2015 Nissan Altima from HNL Automotive Inc. (the dealership) pursuant to a retail installment sales contract. The contract included the following language from title 16, section 433.2 of the Code of Federal Regulations:

> "NOTICE: ANY HOLDER OF THIS CONSUMER CREDIT CONTRACT IS SUBJECT TO ALL CLAIMS AND DEFENSES WHICH THE DEBTOR COULD ASSERT AGAINST THE SELLER OF GOODS OR SERVICES OBTAINED PURSUANT HERETO OR WITH THE PROCEEDS HEREOF. RECOVERY HEREUNDER BY THE DEBTOR SHALL NOT EXCEED AMOUNTS PAID BY THE DEBTOR HEREUNDER."

This language is commonly referred to as the Holder Rule. (*Lafferty v. Wells Fargo Bank, N.A.* (2018) 25 Cal.App.5th 398,

404 (*Lafferty*).) We discuss in depth the Holder Rule and who is a holder in the final portion of our Discussion section below. Following plaintiff's purchase, TD accepted assignment of the retail installment sales contract and became the "Holder" of plaintiff's retail installment sales contract.

Advertisements for the particular vehicle plaintiff purchased showed that it had cruise control, 6-way power-adjustable seats, and other specific features. Plaintiff is disabled, and because of her disabilities, cruise control and power-adjustable seats were necessary features. After the purchase, plaintiff learned that the vehicle did not have cruise control or 6-way power-adjustable seats, and did not meet the requirements of the Nissan Certified Pre-Owned program as advertised.

## 2. *Plaintiff's Complaint and Trial*

In September 2016, less than two months after purchasing the vehicle, plaintiff filed this lawsuit against the dealership and TD in the trial court. Her complaint had six causes of action, alleging misrepresentation in violation of the Consumer Legal Remedies Act related to the vehicle's certification, breach of implied warranty under the Song-Beverly Consumer Warranty Act (Song-Beverly) codified in Civil Code section 1790 et seq., fraud and deceit, negligent misrepresentation, violation of Business and Professions Code section 17200, and violation of Vehicle Code section 11711 (vehicle fraud).[1] Plaintiff alleged that due to the inclusion of the Holder Rule language in the retail installment sales contract, TD was liable for all of the dealership's misconduct in the sale of the vehicle.

Trial occurred in April 2018. The cause was submitted to the jury with directions to return a verdict on four causes of

---

[1] All subsequent statutory references are to the Civil Code unless indicated otherwise.

3

action.  The jury found for plaintiff on one cause of action—violation of the implied warranty of merchantability under Song-Beverly.  The jury's findings established plaintiff purchased a motor vehicle from the dealership, the dealership was in the business of selling motor vehicles to retail buyers, the dealership failed to adequately package and label the 2015 Nissan, and the vehicle failed to conform to the promises or affirmations of fact made on the container or label.  The jury found that the purchase contract for the vehicle was assigned from the dealership to TD.

The jury found that plaintiff's total damages were $21,957.25.  On May 29, 2018, the court entered judgment in favor of plaintiff and against the dealership and TD, jointly and severally, in the amount of $21,957.25.  The judgment left blank the amount of costs, attorney's fees, and prejudgment interest to be awarded.[2]

### 3. *Posttrial Motion for Attorney's Fees*

On July 26, 2018, plaintiff filed a posttrial motion seeking the award of attorney's fees.  Plaintiff sought $169,602, which consisted of a lodestar figure of $141,335 and a 0.2 multiplier.  Plaintiff supported the motion with declarations from Hallen D. Rosner and Michael A. Klitzke, respectively the partner and associate from Rosner, Barry & Babbit LLP, who had been working on her case.  Rosner's declaration authenticated the firm's attached billing records, provided citation to similar cases where the firm's hourly rates had previously been approved, described each attorney's experience and qualifications, noted

---

[2]     The record does not include motions or orders related to costs or prejudgment interest, but the case summary indicates at least the issue of costs was litigated by the parties.  We do not discuss costs or prejudgment interest as they are not raised on appeal.

4

that the firm's rates were not increased in contingency matters, and explained the risks the firm weathered in taking this used-vehicle case on a contingency basis. Klitzke's declaration authenticated documents related to the litigation, as well as various communications between himself and opposing counsel. He also described his legal experience and explained his hourly rate.

In the motion, plaintiff asserted that TD was liable for attorney's fees in addition to the amounts plaintiff paid under the retail installment sales contract. Plaintiff argued the Holder Rule did not bar plaintiff's recovery of attorney's fees from TD.

In its opposition, defendants objected to the declarations of plaintiff's counsel in support of the motion, and argued plaintiff failed to provide evidence of Rosner's hourly rate. Defendants asserted that the fee award should be reduced by 83 percent because plaintiff succeeded on only one of the six causes of action that had been alleged. Defendants also argued the lodestar multiplier was not appropriate because the lawsuit was not exceptionally difficult and plaintiff's counsel was not exceptionally skilled. Lastly, citing *Lafferty v. Wells Fargo Bank* (2013) 213 Cal.App.4th 545, 563, defendants argued pursuant to title 16, section 433.2 of the Code of Federal Regulations, that TD was not liable for the attorney fees because as the holder of the retail installment sales contract, its liability could not exceed the amount plaintiff paid to TD.

On August 29, 2018, the trial court heard argument from counsel. In response to defendants' argument that plaintiff's fees should be apportioned, the court found that defendants' "mathematical" proposal of giving plaintiff one-sixth of the fees was not appropriate. The court stated: "I've decided they [plaintiff's counsel] have satisfied the burden establishing that there is no need for any sort of allocation, and it in fact would be

5

impossible, and your failure to make any suggestion to the contrary other than your mathematical equation I think demonstrates that. It's just the facts and the legal theories were completely intertwined, and I don't think that there is any way that the court can or should be required to go through on a line-by-line basis and try to figure out what work went – somehow went to a fraud cause of action that did not also relate to the successful cause of action."

In response to defendants' argument that a multiplier should not be applied to the lodestar figure because it was a simple case, the court stated: "You didn't make it simple, Mr. McCreary [defense counsel], nor did your client. I was here for this, so this is not just counsel amongst themselves discussing how, you know, difficult discovery . . . which is out of the presence of the jury. I saw plenty in my handing of this case, and whether it was because of your client or for some other reason, what would have been or could have been a fairly simple case was made much more complicated by your client's posture in this matter from the beginning to the end, as far as the court's concerned."

In an eleven-page minute order explaining its decision, the court awarded plaintiff $169,602 in attorney's fees.[3] The court reiterated that apportionment was not necessary or possible based on intertwined facts of the case and that $141,335 in fees was reasonably incurred by plaintiff in prosecuting the action. The court indicated it was capable of assessing whether the

---

[3]     Plaintiff points out that defendants failed to include the judgment in the record. We observe that the judgment on the jury verdict can be found in the first volume of the clerk's transcript at page 121. The minute order granting attorney's fees directed the clerk to affix the attorney fees order to this judgment.

lodestar was reasonable.  The court also stated Rosner's hourly rate was obvious from the billing records, and pointed out that defendants did not claim his rate to be unreasonable.  The court largely overruled defendants' evidentiary objections to plaintiff's counsel's declarations.[4]

## *DISCUSSION*

Defendants contend on appeal that (1) plaintiff's attorneys failed to provide evidence of their hourly rates and failed to establish that their hourly rates are the prevailing rates in the community; (2) attorney's fees should be reduced because plaintiff did not succeed on all claims; (3) the court abused its discretion by applying a lodestar multiplier to the fees, and (4) TD is not liable for attorneys' fees in this matter.  We address each issue in turn.

1.   ***Legal Overview for Awarding Attorney's Fees in Lemon Law Cases***

The jury found defendants liable for breach of the implied warranty of merchantability under Song-Beverly, commonly known as the automobile "lemon law." (*Duale v. Mercedes–Benz USA, LLC* (2007) 148 Cal.App.4th 718, 721.)  In its more typical application, Song-Beverly requires automobile manufacturers to repair a new motor vehicle within a reasonable number of attempts.  If the manufacturer cannot repair the vehicle, the manufacturer must replace it or pay restitution to the buyer, at the buyer's election.  (§ 1793.2, subd. (d)(2).)  The present case is not about unsuccessful efforts to repair a vehicle but is for breach

---

[4]     The court sustained a single hearsay objection to an exhibit titled "United States Consumer Law Attorney Fee Survey Report 2015-1016," which was attached to attorney Klitzke's declaration in support of plaintiff's motion for attorney's fees.

7

of the implied warranty of merchantability in the sale of a vehicle to plaintiff.[5]  Section 1794, subdivision (a) permits the buyer to bring an action for recovery of damages and other relief.

If the buyer prevails in the action against the seller, "the buyer shall be allowed by the court to recover as part of the judgment a sum equal to the aggregate amount of costs and expenses, including attorney's fees based on actual time expended, determined by the court to have been reasonably incurred by the buyer in connection with the commencement and prosecution of such action." (§ 1794, subd. (d).)  "[A] prevailing buyer has the burden of showing that the fees incurred were allowable, were reasonably necessary to the conduct of the litigation, and were reasonable in amount." (*Doppes v. Bentley Motors, Inc.* (2009) 174 Cal.App.4th 967, 998 (*Doppes*).)  "The reasonable hourly rate is that prevailing in the community for similar work." (*PLCM Group, Inc. v. Drexler* (2000) 22 Cal.4th 1084, 1095.)

Courts apply the lodestar method in calculating attorney's fees. (*Robertson v. Fleetwood Travel Trailers of California, Inc.* (2006) 144 Cal.App.4th 785, 818-819 (*Robertson*); *Ketchum v. Moses* (2001) 24 Cal.4th 1122, 1135 (*Ketchum*).)  "That method requires the trial court to first determine a touchstone or lodestar figure based on a careful compilation of the actual time spent and reasonable hourly compensation for each attorney.  [Citation.] The touchstone figure may then be augmented or diminished by

---

[5]     Section 1792 provides:  "Unless disclaimed in the manner prescribed by this chapter, every sale of consumer goods that are sold at retail in this state shall be accompanied by the manufacturer's and the retail seller's implied warranty that the goods are merchantable.  The retail seller shall have a right of indemnity against the manufacturer in the amount of any liability under this section."

8

taking various relevant factors into account, including (1) the novelty and difficulty of the questions involved and the skill displayed in presenting them; (2) the extent to which the nature of the litigation precluded other employment by the attorneys; and (3) the contingent nature of the fee award, based on the uncertainty of prevailing on the merits and of establishing eligibility for the award.  [Citation.]  As the Supreme Court subsequently explained, the initial lodestar amount is based on the reasonable rate for *noncontingent* litigation of the same type, which amount may then be enhanced (e.g., through use of a so-called multiplier) to account for factors such as the contingent nature of the case:  'The purpose of such adjustment is to fix a fee at the fair market value for the particular action.  In effect, the court determines, retrospectively, whether the litigation involved a contingent risk or required extraordinary legal skill justifying augmentation of the unadorned lodestar in order to approximate the fair market rate for such services.' " (*Robertson, supra,* 144 Cal.App.4th at p. 819.)  "In making its calculation, the court may rely on its own knowledge and familiarity with the legal market, as well as the experience, skill, and reputation of the attorney requesting fees."  (*569 East County Boulevard LLC v. Backcountry Against the Dump, Inc.* (2016) 6 Cal.App.5th 426, 437 (*569 East County*).)

        "We review an award of attorney fees under [Song–Beverly] for abuse of discretion.  [Citations.]  We presume the trial court's attorney fees award is correct. . . .  'The " 'experienced trial judge is the best judge of the value of professional services rendered in his [or her] court, and while his [or her] judgment is of course subject to review, it will not be disturbed unless the appellate court is convinced that it is clearly wrong.' " ' " (*Doppes, supra,* 174 Cal.App.4th at p. 998.)

9

## 2.    *Substantial Evidence Supported the Lodestar Amount*

Defendants assert plaintiff "did not establish or mention Mr. Rosner's hourly billing rate whatsoever.  Mr. Rosner did not provide any evidence of his hourly rate, and Appellants were unable to determine from the submissions Mr. Rosner's hourly rate."  (Emphasis omitted.)  Defendants mischaracterize the record.

Plaintiff's fee motion was accompanied by a declaration from Rosner.  Attached to that declaration was a copy of the firm's invoice for all work completed on the case.  The invoice included a description of the work performed, identification of the attorney that performed the work, and that attorney's hourly rate.  Multiple attorneys from the firm worked on the case, and each attorney's hourly rate was reflected on the invoice, including (as noted by the trial court) Rosner's own rate.  Substantial evidence supported that part of the lodestar based on counsel's hourly rate and hours worked.

Defendants also argue that plaintiff's counsel failed to establish that their hourly rates are the prevailing rates in the community.  Rosner's declaration dedicated three paragraphs and multiple exhibits to establishing that the firm's rates are competitive in the local market, and he attached a national survey of prevailing rates among consumer protection attorneys, including rates for California attorneys.  The declarations of Rosner and Klitzke included a section on the experience and qualifications of each attorney and paralegal who billed on the case.  Defendants offer no authority to suggest that further evidence is needed to establish market rates in the community.  The evidence was sufficient for the trial court which also observed that it was capable of assessing market rates in the community sua sponte.  (See *569 East County, supra,* 6 Cal.App.5th at p. 437 ["In making its calculation, the court may

10

rely on its own knowledge and familiarity with the legal market, as well as the experience, skill, and reputation of the attorney requesting fees."].)  Substantial evidence supported the lodestar amount.

In three conclusory sentences in their opening brief and without citation to authority, defendants generally argue that the trial court improperly overruled their foundation and hearsay objections to Rosner's and Klitzke's declarations.  Defendants fail to make specific arguments about each objection on appeal or provide legal support for their position.  We consider those points no further as "issues not addressed as error in a party's opening brief with legal analysis and citation to authority are forfeited." (*Golden Door Properties, LLC v. Superior Court* (2020) 52 Cal.App.5th 837, 890.)

3.      ***No Abuse of Discretion in Refusing to Apportion the Fee Award***

We also find no abuse of discretion in the trial court's refusal to apportion attorney's fees based on plaintiff's success on one cause of action.

When a plaintiff is successful, "the fact that he or she has prevailed on some claims but not on others is a factor to be considered in determining the amount of the fee awarded." (*Lyons v. Chinese Hosp. Assn* (2006) 136 Cal.App.4th 1331, 1345.) Nonetheless, it is well-established that " '[a]ttorneys fees need not be apportioned between distinct causes of action where plaintiff's various claims involve a common core of facts or are based on related legal theories.' "  (*Graciano v. Robinson Ford Sales, Inc.* (2006) 144 Cal.App.4th 140, 159; *Downey Cares v. Downey Community Development Com.* (1987) 196 Cal.App.3d 983, 997; see *Harman v. City and County of San Francisco* (2007) 158 Cal.App.4th 407, 421 ["There is 'no mathematical rule requiring proportionality between compensatory damages and

11

attorney's fees awards, [citation], and courts have awarded attorney's fees where plaintiffs recovered only nominal or minimal damages."].)

Here, the court found that apportionment was not possible because the claims involved a common core of facts and intertwined legal theories. The record supports the court's view. Plaintiff's claims are based on a single set of facts: the dealership falsely representing that the vehicle had cruise control, 6-way power-adjustable seats, and other specific features. Each of plaintiff's causes of action revolve around these misrepresentations. Defendants do not explain how the causes of action were distinct from one another or based on different sets of facts.

We find no abuse of discretion.

4. ***No Abuse of Discretion in Applying a Lodestar Multiplier***

Defendants argue the court abused its discretion in applying a lodestar multiplier to attorney's fees because the "lawsuit was [a] simple factual and legal case involving a car transaction where the jury determined that the labeling on the car was incorrect under the Song Beverly Act."

Our Supreme Court has instructed that while the lodestar amount "is the basic fee for comparable legal services in the community; it may be adjusted by the court based on factors including . . . (1) the novelty and difficulty of the questions involved, (2) the skill displayed in presenting them, (3) the extent to which the nature of the litigation precluded other employment by the attorneys, [and] (4) the contingent nature of the fee award." (*Ketchum, supra,* 24 Cal.4th at p. 1132.)

Here, plaintiff solely requested a multiplier based on her counsel's contingent risk. "The purpose of a fee enhancement, or so-called multiplier, for contingent risk is to bring the financial

12

incentives for attorneys enforcing important constitutional rights . . . into line with incentives they have to undertake claims for which they are paid on a fee-for-services basis." (*Ketchum, supra,* 24 Cal.4th at p. 1132.) The lodestar enhancement "is intended to approximate market-level compensation for such services, which typically includes a premium for the risk of nonpayment or delay in payment of attorney fees." (*Id.* at p. 1138.)

Defendants focus on the novelty of the case in arguing the multiplier was an abuse of discretion. Defendants do not address the contingency risk, or any other factor that courts may consider when awarding a multiplier enhancement.

We conclude the trial court did not abuse its discretion in awarding a 0.2 multiplier to account for the inherent risks associated with taking the case on contingency and fronting all costs of litigation. Rosner's declaration explained that the firm bills at the same rate for contingent and non-contingent cases. Rosner also attested to the risks associated with contingent cases. The requested multiplier was modest and it accounted for the risk plaintiff's counsel took in litigating the case against defendants whom the court found made the case challenging and protracted. The trial court specifically found defense counsel's litigation tactics complicated the case and made what could have been a "simple" case into a difficult one.[6] On this record, there was no abuse of discretion.

---

[6] It appears that during litigation, defendants made it difficult to secure witnesses, refused to appear and complete depositions, and withheld documents.

13

5.      ***The Holder Rule Does Not Limit TD Auto Finance's Liability for Attorney's Fees***

Defendant TD alone argues that it is not liable for attorney's fees based on the Holder Rule (16 C.F.R. § 433.2).  We disagree.

a.      *The Holder Rule*

The Federal Trade Commission (FTC) "promulgated the Holder Rule in 1975 as a consumer protection measure to abrogate the holder in due course rule for consumer installment sale contracts that are funded by a commercial lender. [Citations.]  'Under the holder in due course principle, the creditor could "assert his right to be paid by the consumer despite misrepresentation, breach of warranty or contract, or even fraud on the part of the seller, and despite the fact that the consumer's debt was generated by the sale." ' [Citation.]  'Before the FTC rule, if a seller sold goods on credit and transferred the credit contract to a lender, the lender could enforce the buyer's promise to pay even if the seller failed to perform its obligations under the sales contract.  Similarly, despite a seller's breach, the buyer was obligated to pay the lender under a consumer loan contract that directly financed the purchase of goods or services from the seller.' " (*Lafferty, supra,* 25 Cal.App.5th at pp. 410–411.)  " 'In abrogating the holder in due course rule in consumer credit transactions, the FTC preserved the consumer's claims and defenses against the creditor-assignee.  The FTC rule was therefore designed to reallocate the cost of seller misconduct to the creditor.  The commission felt the creditor was in a better position to absorb the loss or recover the cost from the guilty party—the seller.' " (*Id.* at p. 411.)

The FTC's regulation requires the following notice to be given in every consumer installment sales contract that is funded

14

by a commercial lender (*Lafferty, supra,* 25 Cal.App.5th at p. 404):

> "NOTICE: ANY HOLDER OF THIS CONSUMER CREDIT CONTRACT IS SUBJECT TO ALL CLAIMS AND DEFENSES WHICH THE DEBTOR COULD ASSERT AGAINST THE SELLER OF GOODS OR SERVICES OBTAINED PURSUANT HERETO OR WITH THE PROCEEDS HEREOF. RECOVERY HEREUNDER BY THE DEBTOR SHALL NOT EXCEED AMOUNTS PAID BY THE DEBTOR HEREUNDER." (16 C.F.R. § 433.2.)

The FTC regulation requiring use of this notice is known as the Holder Rule.[7] Somewhat more informally, the liability imposed by the notice – in contrast to the otherwise applicable holder in due course principle – is also known as the Holder Rule.

b.      *The Parties' Contentions and Overview*

The parties wrestle with the final sentence of the Holder Rule, which states that recovery by the debtor shall not exceed the amounts paid by the debtor under the installment sales contract. TD asserts that this limits plaintiff's recovery of both damages *and attorney's fees* to the amount she paid under the retail sale installment contract. Plaintiff argues the limit applies only to compensatory damages.

A number of voices, including state and federal courts, the California Legislature, and the FTC, have all expressed opinions

---

[7]      The Regulation provides that it is a deceptive trade practice to omit the Holder Rule Notice in a consumer credit contract. (16 C.F.R. § 433.2.) A consumer credit contract is, in turn, defined as "[a]ny instrument which evidences or embodies a debt arising from a 'Purchase Money Loan' transaction or a 'financed sale' " as those terms are themselves defined by regulation. (16 C.F.R. § 433.1(i).)

on the issue – many of them contradictory.  A broad overview of the situation, which we will discuss in greater detail below, is this:  In California, the Third Appellate District in *Lafferty, supra,* 25 Cal.App.5th 398, held that the Holder Rule's cap on recovery applies to attorney's fees as well as damages.  In response to *Lafferty*, the California Legislature enacted a statute, Civil Code section 1459.5, intended to abrogate *Lafferty* and allow recovery of attorney's fees in excess of the Holder Rule's cap.[8]

In the meantime, other jurisdictions were also struggling with the issue.  Some courts found the Holder Rule's cap applied to attorney's fees. (E.g., *Simpson v. Anthony Auto Sales, Inc.* (W.D. La. 1998) 32 F.Supp.2d 405, 410; *State ex rel. Stenberg v. Consumer's Choice Foods, Inc.* (Neb. 2008) 755 N.W.2d 583, 595; *Scott v. Mayflower Home Imp. Corp.* (2001) 363 N.J.Super. 145, 165-166, overruled on other grounds by *Psensky v. American Honda Finance Corp.* (2005) 378 N.J.Super. 221, 231.)  Others found it did not. (E.g., *Oxford Finance Cos. v. Velez* (Tx.Ct.App. 1991) 807 S.W.2d 460, 464-465.)  Still others imposed attorney's fees on holders in excess of the cap without even addressing the issue. (E.g., *Diaz v. Paragon Motors of Woodside, Inc.* (E.D.N.Y. 2008) 2008 WL 2004001; *In re Stewart* (E.D.Pa. 1988) 93 B.R. 878, 879.)

At the same time, as part of its review of its regulations, the FTC sought comments on the costs, benefits, and impact of

---

[8]    Section 1459.5 provides:  "A plaintiff who prevails on a cause of action against a defendant named pursuant to Part 433, Title 16 of the Code of Federal Regulations or any successor thereto, or pursuant to the contractual language required by that part or any successor thereto, may claim attorney's fees, costs, and expenses from that defendant to the fullest extent permissible if the plaintiff had prevailed on that cause of action against the seller."

16

the Holder Rule. (80 FR 75018.) It received a number of responses, a handful of which mentioned attorney's fees and an even smaller number of which identified the split in the law regarding the application of the cap to attorney's fees. (<https://www.ftc.gov/policy/public-comments/2015/12/initiative-631> [as of January 26, 2021] as archived <https://perma.cc/N3SN-NPSC>.) The FTC issued a Rule Confirmation in which it confirmed the Holder Rule with no modifications, but volunteered its opinion that the Holder Rule's cap applied to attorney's fees. (84 FR 18711.)

Thereafter, the issue presented itself again in California, this time, before the First Appellate District, Division Five, in *Spikener v. Ally Financial, Inc.* (2020) 50 Cal.App.5th 151 (*Spikener*). The *Spikener* court concluded that the FTC's construction of the rule was "dispositive on the Holder Rule's application to attorney fees." (*Id.* at p. 158.) The court also determined that Civil Code section 1459.5 was preempted by the Holder Rule as so interpreted. (*Id.* at p. 160.)[9]

Not surprisingly, TD would have us follow *Lafferty* and *Spikener*.[10] In our ensuing discussion, we first disagree with *Lafferty*'s interpretation of the Holder Rule, and conclude that the Holder Rule's cap itself does not apply to attorney's fees. Then, we disagree with *Spikener*'s conclusion regarding the binding

---

[9] Unlike *Spikener*, *Lafferty* was not a preemption case. *Lafferty* interpreted the Holder Rule's cap as applying to attorneys' fees. (*Lafferty, supra,* 25 Cal.App.5th at p. 414.)

[10] When the parties briefed this issue, *Spikener* had not yet been decided. Upon this court's request, the parties addressed *Spikener* at oral argument.

17

nature of the FTC's contrary interpretation in its Rule Confirmation.

   c.   *The Holder Rule Cap Does Not Apply to Attorney Fees*

Preliminarily, we set forth the rules of interpretation which apply to regulations.  Next, we discuss the rationale of the *Lafferty* court which led it to conclude the Holder Rule's cap applies to attorney's fees.  Lastly, we explain our disagreement with *Lafferty* and proffer our own, contrary, interpretation.

   (i)   Rules of Regulatory Interpretation and
         Standard of Review

Generally, we apply the same rules governing statutory interpretation to the interpretation of administrative regulations. (*Regents of the University of California v. Public Employment Relations Bd.* (2020) 51 Cal.App.5th 159, 187.)

"In interpreting a statute, our primary goal is to determine and give effect to the underlying purpose of the law.  [Citation.] 'Our first step is to scrutinize the actual words of the statute, giving them a plain and commonsense meaning.'  [Citation.]  ' "If the words of the statute are clear, the court should not add to or alter them to accomplish a purpose that does not appear on the face of the statute or from its legislative history.' "  [Citation.]  In other words, we are not free to 'give words an effect different from the plain and direct import of the terms used.'  [Citations.] However, ' "the 'plain meaning' rule does not prohibit a court from determining whether the literal meaning of a statute comports with its purpose or whether such a construction of one provision is consistent with other provisions of the statute." ' [Citations.]  To determine the most reasonable interpretation of a statute, we look to its legislative history and background." (*Goodman v. Lozano* (2010) 47 Cal.4th 1327, 1332.)

18

We review statutory interpretation and preemption questions de novo.  (*Spielholz v. Superior* Court (2001) 86 Cal.App.4th 1366, 1371.)

### (ii)     Lafferty's Rationale

In *Lafferty*, the plaintiffs purchased a vehicle under an installment contract, which was later assigned to a holder, *i.e.* a credit company.  (*Lafferty, supra,* 25 Cal.App.5th at p. 405.)  Like the case at bar, the plaintiffs sued the holder pursuant to the Holder Rule.  (*Id.* at pp. 406–407.)  After the plaintiffs and the holder entered into a settlement agreement where the holder paid the plaintiffs the amount paid under the installment contract, the plaintiffs moved for attorney fees.  The trial court denied fees as barred by the Holder Rule's limitation on recovery in excess of the amount paid by the plaintiffs under the installment sales contract.  (*Id.* at pp. 407-408.)

Relying on two California and two out-of-state cases, the *Lafferty* court stated the "term 'recovery' is broad and regularly used to include compensatory damages, punitive damages, attorney fees, and costs."  (*Lafferty, supra,* 25 Cal.App.5th at p. 412.)  The *Lafferty* court held:  "a consumer cannot recover more under the Holder Rule cause of action than what has been paid on the debt regardless of what kind of a component of the recovery it might be—whether compensatory damages, punitive damages, or attorney fees."  (*Id.* at p. 414.)

### (iii)    Our Interpretation of the Language of the Holder Rule

The statutory interpretation question for us is:  Does the word "recovery," as used in the Holder Rule, include attorney's fees.  If "recovery" includes attorney's fees, then the Holder Rule's limitation that recovery "by the debtor shall not exceed amounts paid by the debtor hereunder," means that the court would add the attorney's fees to the compensatory award and limit the total

19

recovery to the amount the debtor paid under the purchase agreement. That is *Lafferty's* holding. (*Lafferty, supra,* 25 Cal.App.5th at p. 412.)

Black's Law Dictionary defines "recovery" as "1. The regaining or restoration of something lost or taken away. . . . [¶] 2. The obtainment of a right to something (esp. damages) by a judgment or decree. . . . 4. An amount awarded in or collected from a judgment or decree." (Recovery Definition, Black's Law Dict. (11th ed. 2019) available at Westlaw; see *Wasatch Property Management v. Degrate* (2005) 35 Cal.4th 1111, 1121–1122, ["When attempting to ascertain the ordinary, usual meaning of a word, courts appropriately refer to the dictionary definition of that word"].) The dictionary definition of recovery focuses on damages, i.e. restoring money that was taken away from the plaintiff, and does not expressly address attorney's fees.

To the extent that *Lafferty* cites several cases that discuss recovery to include attorney's fees in contexts outside the Holder Rule, we do not find these to be persuasive in defining recovery for the purpose of the Holder Rule. The Rule's legislative history makes clear that the objective of the Holder Rule was to compel "creditors to either absorb seller misconduct costs or return them to sellers, by denying sellers access to cut-off devices," thereby discouraging "predatory practices and schemes." (Preservation of Consumers' Claims and Defenses, 40 FR 53506 (Nov. 18, 1975) p. 53523.) In its "Statement of Basis and Purpose" published in the Federal Register in conjunction with the Holder Rule's enactment, the FTC stated: "It is unfair to subject an innocent party to costs and harm occasioned by a guilty party. Consumers are clearly injured by a system which forces them to bear the full risk and burden of sales related abuses. There can be little commercial justification for such a system. The desired reallocation of cost and risk will both reduce the costs of seller

20

misconduct in the marketplace and return the residuum to the guilty parties.  Consumers and honest merchants will benefit as prices come to reflect actual transactions costs and honest merchants no longer need compete with those who rely on abusive sales practices." (*Ibid.*)

The FTC also found that pre-existing law placed consumers in a precarious position of being financially incapable of enforcing their rights in court:  "The Commission further finds that aggrieved consumers are often not in a position to take advantage of the legal system.  Where seller misconduct in a credit sale transaction has given rise to consumer injury, the consumer is theoretically in a position to seek damages or other relief from the seller in court.  . . .  However, in such cases the consumer must pay the creditor holding his note or contract whether or not he ultimately receives a judgment against the seller.  . . .  [S]uch damages are rarely enough to attract competent representation.  The sheer costs of recourse to the legal system to vindicate a small claim, together with the days of work that must be missed in order to prosecute such a claim to judgment, render recourse to the legal system uneconomic.  In addition, the worst sellers . . . prove difficult to locate and serve, and the marginal liquidity which characterizes their operations makes collection of a judgment difficult or impossible even if they are successfully served.  Bankruptcy or insolvency becomes a final barrier to recovery." (40 Fed. Reg. 53512.)  The Holder Rule was the FTC's answer to such consumer impediments.

In August 1976, at a congressional hearing on the recently enacted Holder Rule, acting director of the FTC's Bureau of Consumer Protection, Margery Waxman Smith, made the following statements, which echoed the FTC's comments above:

"In times past, when sellers were fewer and consumer credit was less pervasive, it may have been

21

reasonable to conclude that consumers could assess the risks of seller nonperformance more efficiently than a note purchaser.  Under these conditions, a rule of law favoring holders-in-due course may have promoted economic efficiencies.  But in today's complex credit-oriented economy of mass production and distribution, where buyers and sellers transact impersonally for standardized products, it may no longer be most efficient to place all the risks of seller nonperformance on the buyer.  This is particularly true where the creditor has frequent dealings with the seller though common ownership, affiliation or a regular course of dealing.  The Commission's rule, in short, carefully shifts some of these risks from consumers to those who have a better and more efficient means of assessing them, pricing them, and shifting them back to the seller.

"The purpose of the rule is to recognize these realities.  Consumers who are victimized by seller misconduct and compelled to pay a third-party creditor are not in a position to obtain redress for their injuries, thus shifting the costs back to the seller.  The reasons for this situation are many.  They revolve around the costs of taking time off from work, finding legal representation in a context which the law would generally classify as a small claim, undertaking the costs of litigation, and meeting a rigid payments schedule whatever the ultimate result of such efforts may be.

"Creditors, in those situations to which the rule applies, are in a position to shift the risk back where it belongs, either directly or through the price

mechanism. They deal in volume while consumers deal once. Creditors enjoy ready access to commercial information which consumers cannot obtain. They have the leverage to return risks to the sellers they finance. They can spread information costs over many transactions. All together their comparative advantage here is incalculable. [¶]

"The required provision does contain one express cautionary limitation on a creditor's exposure. The consumer may never recover consequential damages under the provision which exceed the amount of the credit contract."

(Consumer Claims and Defenses: Hearings Before the Subcomm. on Consumer Protection and Finance of the Comm. on Interstate and Foreign Commerce House of Rep., 94th Cong., 2nd Sess. (1976), Serial No. 94-145, pp. 22-23.)

Acting Director Smith's comments indicate that at the time the FTC's position on the limitation on recovery was that the rule limited consequential damages, not attorney's fees. To include attorney's fees in the Holder Rule's limitation on recovery would be out of sync with its objective of reallocating the costs of the seller's misconduct from the consumer back to the seller and creditor. Attorney's fees "is a form of compensation that, along with an award of actual damages, permits the consumer to be made whole. . . . [O]ne of the objectives of the Holder Rule is to internalize the costs of a seller's misconduct. Those costs include the expense of obtaining compensation for injury caused by the seller's misconduct." (Greenfield & Ross, *Limits on a Consumer's Ability to Assert Claims and Defenses under the FTC's Holder in Due Course Rule* (1991) 46 Business Lawyer 1135, 1148.)

One commentator suggested that if the creditor is not responsible for attorney fees and costs, there would be an incentive to intentionally prolong litigation and cause a consumer to spend more prosecuting the case than the recovery available under the sales contract. "Exposure to liability for fees and costs . . . has a tendency to cut down on litigation and encourage settlement because commercial parties have less incentive to stall the litigation until the case goes away. This ability to stall is especially implicated when the commercial parties have the resources to continue the litigation while wearing down the resources of the consumer." (Rosmarin, *Consumers-R-Us: A Reality in the U.C.C. Article 2 Revision Process* (1994) 35 Wm. & Mary L.Rev. 1593, 1615.) "The statutory availability of attorney's fees and costs to a prevailing consumer is another way to level the playing field between the consumer and commercial parties to the transaction." (*Id.* at p. 1616.) Both consumer rights and the rule's purpose would be frustrated if attorney fees were not recoverable from both the seller and the creditor-assignee.[11]

> d.    *The FTC's Rule Confirmation Does Not Change This Result*

Were we writing on a clean slate – or one which involved only *Lafferty* – our analysis would be complete. But TD argues that, as Division Five of the First District held in *Spikener*, the language in the FTC's Rule Confirmation is entitled to such deference as to preclude our interpretation to the contrary and, therefore, to preemptively nullify Civil Code section 1459.5. Our rejection of this argument begins with an explanation of how the relevant language in the FTC's Rule Confirmation came to be.

---

[11]    Of course, the California Legislature has taken a similar view in its enactment of Civil Code section 1459.5.

(i)     History of the FTC's Rule Confirmation

In December 2015, the FTC requested public comment on "the overall costs and benefits, and regular and economic impact" of the Holder Rule "as part of the agency's regular review of all its regulations and guides."  (80 FR 75018.)  The request for comment identified 15 questions on which the FTC sought comment, including whether the Holder Rule should be modified in any way, but asked no questions specifically about attorney's fees.  (80 FR 75019.)  If the responding party believed any modifications to the Rule should be made, the party was also required to answer sub-questions on what evidence supported the proposed modifications, and how the modifications would affect the costs and benefits of the rule for consumers and businesses. (80 FR 75019.)

Nineteen comments were received, ranging from multi-page analyses of the Holder Rule submitted by consumer advocacy groups and trade associations for consumer credit agencies to single paragraphs submitted by individuals. (<https://www.ftc.gov/policy/public-comments/2015/12/initiative-631> [as of January 26, 2021], archived at <https://perma.cc/D4MP-68VS>.)

Of the nineteen comments received, only six of them addressed the issue of attorney's fees under the Holder Rule – their positions differed both on whether the Holder Rule cap *did* apply to attorney's fees and whether it *should*.  Two consumer organizations believed that the Holder Rule's cap did not presently apply to attorney fees, but requested the FTC to clarify that it did not.  Specifically, the National Association of Consumer Advocates asked that the FTC "clarify that the Holder Rule's cap on recovery does not apply to attorney fees that the holder incurs."  (<https://www.ftc.gov/system/files/documents/public_comments/2016/02/00029-100584.pdf>, p. 3 [as of January

26, 2021], archived at <https://perma.cc/W2EH-L7UP>.) The National Consumer Law Center agreed, stating that the FTC should "[c]larify that the Rule's cap on recovery does not apply to attorney fees for which the holder is liable because of the holder's own litigation conduct." (<https://www.ftc.gov/system/files/ documents/public_comments/2016/02/00015-100535.pdf>, p.8 [as January 26, 2021], archived at <https://perma.cc/CP4Y-DY49>.) The National Consumer Law Center argued that "[c]larification of this point is necessary because while many courts allow fees above the cap, others do not." (*Ibid.*, fns. omitted.) Footnotes collected cases on both sides of the issue. (*Ibid.,* fns. 29 & 30.) Its comment offered policy reasons for why fees should not be encompassed by the Holder Rule's cap. (*Id.* at pp. 8-9.)

Two others wanted the Holder Rule's cap eliminated *entirely*, in language which appears to have assumed the cap presently applied to attorney fees. MFY Legal Services, Inc. sought elimination of the cap to ensure that "consumers are made whole, as many of their damages for fraud and breach of contract exceed payments made (*e.g.*, cash deposits, cash payments for add-on products, out-of-pocket losses for repairs, attorney's fees, and lost wages) and could have been avoided had the lender heeded their complaints." (<https://www.ftc.gov/system/files /documents/public_comments/2016/02/00011-100533.pdf>, p. 6 [as of January 26, 2021], archived at <https://perma.cc/LV29-PYTS>.) Another individual similarly requested the Holder Rule be modified "to expressly provide that the holder is liable to the consumer for all actual damages proximately caused by the prior holders and original seller, including consequential and incidental damages, as well as attorney fees incurred by the consumer, so long as those remedies would be available to the consumer against prior holders and/or the original seller." (<https://www.ftc.gov/policy/public-comments/2016/02/02/

26

comment-3> [as of January 27, 2021], archived at <https://perma.cc/K6VK-67W5>.)

On the other side of the issue, the American Financial Services Association asked that the FTC "confirm that under the Holder Rule's plain language, any court-awarded sum, under the Rule, must be 'limited to amounts paid by the debtor hereunder.' This limitation includes interest, costs and attorney fees." (<https://www.ftc.gov/system/files/documents/public_comments/2016/02/00025-100572.pdf>, p. 3 [as of January 27, 2021], archived at https://perma.cc/YLF2-ETHW>.)  The association offered case law, including *Lafferty*.  (*Id*. at p. 7, fn. 30, p. 8, fn. 33.)

Taking a position in the middle was CU Direct Corporation, the "nation's largest point-of-sale auto financing and indirect lending network for credit unions . . . ." (<https://www.ftc.gov/system/files/documents/public_comments/2016/02/00027-100578.pdf>, p. 1 [as of January 27, 2021], archived at <https://perma.cc/5MAX-CXRZ>**.**)  Although CU Direct cited no cases, it appeared to be writing from experience that attorney fees were not subject to the cap.  CU Direct also offered a solution.  It expressed a concern about excessive attorney's fees "routinely claimed by plaintiff's counsel as part of the damages that the holder is ultimately responsible to pay under the law." (*Id*. at p. 2.)  It stated, "While it may be reasonable for a lender, as holder of the contract, to be liable for <u>some</u> of the consumer's attorneys' fees, it is far less reasonable to hold a lender liable for <u>excessive</u> or <u>abusive</u> levels of attorneys' fees, especially in cases where they are essentially unable to fight or contest the claim." (*Id*. at p. 3.)  To resolve the problem it perceived, CU Direct sought "a fair and reasonable schedule" of attorney's fees.  (*Ibid*.)

(ii)　The FTC's Rule Confirmation

After reviewing the comments, the FTC "determined to retain" the Holder Rule "in its present form."  (84 FR 18711.)  The

27

FTC issued a Confirmation of Rule that rejected all proposed modifications to the rule, specifically noting that "none of the comments that proposed changing the Rule provided the Commission with specific evidence of the potential costs and benefits of such modifications." (84 FR 18712.)

When it came to the issue of attorney's fees, the FTC explained that "Six comments addressed whether the Rule's limitation on recovery to 'amounts paid by the debtor' allows or should allow consumers to recover attorneys' fees above the cap . . . ."[12] (84 FR 18713.) After itemizing the six comments, the FTC stated, "We conclude that if a federal or state law separately provides for recovery of attorneys' fees independent of claims or defenses arising from the seller's misconduct, nothing in the Rule limits such recovery. Conversely, if the holder's liability for fees is based on claims against the seller that are preserved by the Holder Rule Notice, the payment that the consumer may recover from the holder—including any recovery based on attorneys' fees—cannot exceed the amount the consumer paid under the contract. Claims against the seller for attorneys' fees or other recovery may also provide a basis for set off against the holder that reduces or eliminates the consumer's obligation. The Commission does not believe that the record supports modifying the Rule to authorize recovery of attorneys' fees from the holder, based on the seller's conduct, if that recovery exceeds the amount paid by the consumer." (84 FR 18713.)

---

[12] The FTC's use of "allows or should allow" suggests that the agency itself was unclear whether the Holder Rule actually addressed the issue of attorney's fees at all.

28

### (iii) The Rule Confirmation Is Not Entitled to Dispositive Deference

In *Kisor v. Wilkie* (2019) 139 S.Ct. 2400, 2408 (*Kisor*), the Supreme Court reaffirmed the doctrine of deference to an agency's reading of its own, genuinely ambiguous regulations. However, the court also reaffirmed the limitations of that doctrine. Particularly, in considering deference, "a court must make an independent inquiry into whether the character and context of the agency interpretation entitles it to controlling weight. [Citations.]" (*Id.* at p. 2416.) "The inquiry on this dimension does not reduce to any exhaustive test." (*Ibid.*) However, the court has identified certain markers for identifying when regulatory deference is and is not appropriate. (*Ibid.*)

The four markers the court identified were: First, the "regulatory interpretation must be one actually made by the agency. In other words, it must be the agency's 'authoritative' or 'official position,' rather than any more ad hoc statement not reflecting the agency's views. [Citation.]" (*Kisor, supra,* 139 S.Ct. at p. 2416.) "Next, the agency's interpretation must in some way implicate its substantive expertise." (*Id.* at p. 2417.) "Finally, an agency's reading of a rule must reflect 'fair and considered judgment' to receive . . . deference. [Citation.]" (*Ibid.*) A court should decline to defer to a convenient litigation position or post hoc rationalization. (*Ibid.*) Moreover, a court may not "defer to a new interpretation, whether or not introduced in litigation, that creates 'unfair surprise' to regulated parties. [Citation.] That disruption of expectations may occur when an agency substitutes one view of a rule for another." (*Id.* at pp. 2417-2418.) Such an upending of reliance may occur without an explicit interpretive change; we will not defer to an interpretation that would impose retroactive liability on parties

29

for longstanding conduct the agency never before addressed. (*Id.* at p. 2418.)

We consider each of the four factors the Supreme Court identified in *Kisor* and conclude the FTC's Rule Confirmation is not entitled to conclusive deference under the Court's flexible standard.

First, we assume that the FTC's "regulatory interpretation [is] one actually made by the agency," although even that assumption is somewhat challenged by our consideration of the third factor below.

Second, we do not believe resolution of the issue is easily within the FTC's substantive expertise. This is so for two reasons. (1) Resolution of the issue may turn on the particular state statute providing for attorney's fee recovery at issue, and whether that statute is intended to be punitive against the payor or simply to make the payee whole. (2) As illustrated by the FTC's request for comments which led to the Rule Confirmation, the FTC sought to exercise its judgment based on data regarding the effect of the rule (or any proposed rule change) on consumers and businesses. No commenter provided the FTC with data on the costs and benefits to consumers or businesses in different jurisdictions based on the availability of attorney's fees or any limitations placed on them. Thus, the FTC's statement regarding attorney's fees in its Rule Confirmation was not an exercise of its substantive expertise, but simply a position taken after limited arguments were made on each side.[13]

---

[13] The FTC had not sought comments on this specific issue; its received input was therefore limited to those six comments which had volunteered the information even though not asked expressly. Presumably, if the FTC formally and affirmatively sought comments on whether the Holder Rule's cap should apply

Third, given the informal nature of the FTC's consideration of the issue– one that followed a request for comments that did not mention attorneys' fees – we are not convinced that the confirmation truly represented the " 'fair and considered judgment' [necessary] to receive . . . deference." (*Kisor, supra,* 139 S.Ct. at p. 2416.) Fourth, although we cannot say the position taken in the Rule Confirmation was a change in interpretation – as the FTC had not previously interpreted the rule at all – it did, in fact, address an issue never previously addressed, and undermined the existing practice in those jurisdictions in which attorney fees in excess of the cap had been, and were being, imposed as a matter of course.

(iv)    We Disagree With Spikener

The *Spikener* court reached the opposite conclusion. Purporting to apply the *Kisor* test, the *Spikener* court concluded the FTC's Rule Confirmation was entitled to dispositive deference. The court's analysis on this point, in its entirety, is: "The Rule Confirmation was issued by the FTC and published in the Federal Register, and was indisputably the FTC's official position. Interpretation of the Holder Rule, which provides that taking a consumer credit contract without the prescribed language is an unfair or deceptive act or practice, falls within the expertise of the FTC. [Citation.] The Rule Confirmation issued after the FTC solicited and reviewed public comments and reflects the agency's considered judgment. The FTC's interpretation is entitled to deference. [Citation.]" (*Spikener, supra,* 50 Cal.App.5th at p. 159.)

We are not persuaded. In *Kisor*, the U.S. Supreme Court retained the doctrine of deference to agency interpretations, but

---

to attorney's fees, it would have received a great deal more relevant input on which to make its determination.

31

"reinforce[d] its limits." (*Kisor, supra,* 139 S.Ct. at p. 2408.) The high court emphasized that an agency interpretation is not entitled to deference when it "does not reflect an agency's authoritative, expertise-based, 'fair[, or] considered judgment.' [Citations.]" (*Id.* at p. 2414.) As we have discussed, this requires courts considering the preclusive effect of agency determinations to make "independent inquiry into whether the character and context of the agency interpretation entitles it to controlling weight. [Citations.]" (*Id.* at p. 2416.) We do not believe the *Spikener* court's brief discussion of the issue satisfies this requirement.

Our inquiry into the context of the agency's interpretation, convinces us that *Spikener's* analysis is incorrect. In particular, we find significant that the agency initially had not previously spoken on the issue, and chose to express its opinion without seeking formal input on it. Instead, the FTC had requested comments on the Holder Rule in general terms, seeking arguments on modifying the rule only if supported by data setting forth the impact of any proposed modifications on consumers and businesses. It did not receive that data. Had the FTC issued a modification based on an analysis of submitted data, or after consideration of arguments submitted in response to an express notice, it would have made a stronger case for deference. Instead, the agency, based on no data and limited argument, spoke on an issue on which it had previously remained silent for decades, and had not given notice of an intent to speak. This falls short of the type of considered analysis entitled to dispositive deference. "[W]hether a court should give such deference depends in significant part upon the interpretive method used and the nature of the question at issue." (*Barnhart v. Walton* (2002) 535 U.S. 212, 221-222.) This is particularly so when the issue involved is not exclusively one of federal law, but

32

rather an issue of the intersection of federal law and state law of remedies.  (Cf. *Kisor, supra,* 139 S.Ct. at p. 2417 ["Some interpretive issues may fall more naturally into a judge's bailiwick.  Take one requiring the elucidation of a simple common-law property term, see *Jicarilla Apache Tribe v. Federal Energy Regulatory Com.* (10th Cir.) 578 F.2d 289, 292–293, or one concerning the award of an attorney's fee, see *W. Va. Highlands Conservancy, Inc. v. Norton* (4th Cir. 2003) 343 F.3d 239"].)

Because we conclude the Holder Rule cap does not include attorney's fees within its limit on recovery and that the FTC's interpretation to the contrary is not entitled to deference, the Holder Rule is consistent with section 1459.5, and we need not address whether section 1459.5 independently applies.

### DISPOSITION

We affirm the attorney's fees awarded by the trial court. Plaintiff Tania Pulliam is awarded her costs on appeal.


RUBIN, P.J.

WE CONCUR:



BAKER, J.



KIM, J.